ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. This is an appeal of a jury’s determination that a workers’ compensation insurance carrier acted in bad faith when it delayed paying on a claim. Jennifer Brown Jordan filed a bad-faith claim based on the failure of the carrier to timely pay benefits. A jury sitting before the Jones County Circuit Court found AmFed Companies, LLC, the workers’ compensation carrier, liable for bad faith and awarded compensatory damages which were later set off against money AmFed tendered to Jennifer after she filed her lawsuit, but prior to trial, for a final compensatory damages award of approximately $34,000. The jury also awarded Jennifer $200,000 in punitive damages. Additionally, the circuit court awarded Jennifer $32,500 in attorney’s fees. Aggrieved, AmFed appeals. After careful consideration, we find that the circuit court improperly instructed the jury during the punitive-damages portion of the bifurcated proceedings. However, we do not disturb the jury’s decision re
 
 *1180
 
 garding compensatory damages. Accordingly, we affirm in part and reverse and remand in part.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On May 4, 2001, James H. Brown III died in a work-related electrocution incident during his employment with A & B Electric Company in Jones County, Mississippi. James’s widow, Jennifer, and his dependent children filed a claim for workers’ compensation benefits. A & B’s workers’ compensation carrier, AmFed, assigned the claim to adjuster Stacy Stuart.
 

 ¶ 3. In May 2001, Stuart mailed the first benefit payments to James’s widow, Jennifer. Those payments were payable to Jennifer as James’s widow and James’s three dependent children. Stuart set up Jennifer’s claim in AmFed’s deferred payment system. That system was to issue biweekly checks to Jennifer as well as James’s three children. However, when Stuart set up Jennifer’s payments, Stuart inadvertently directed the program to pay Jennifer approximately $170 every two weeks, instead of $340. In other words, Jennifer and the children would receive one-half of the benefits that they were due.
 

 ¶ 4. In June 2001, Jennifer, acting on her own, obtained a lump-sum order from the Mississippi Workers’ Compensation Commission (the Commission). Jennifer did not file the lump-sum order, so AmFed was unaware of it. Meanwhile, Jennifer had hired attorney Glenn White to file a wrongful death action based on James’s electrocution.
 
 [1]
 

 ¶ 5. In February 2002, Stuart’s replacement, adjuster Daron Perkins, called Jennifer. Perkins contacted Jennifer to ask how the children were doing. Perkins was not aware that Jennifer had filed a wrongful death claim. Jennifer did not mention her lump-sum order. On February 7, 2002, White sent Perkins a letter. White informed Perkins that he was representing Jennifer and the estate. White also informed Perkins that “[a]ll future communications concerning this matter should be directed to [his] office.” Consequently, AmFed did not again attempt to contact Jennifer directly.
 

 ¶ 6. On April 11, 2003, White informed his client, Jennifer, that the wrongful-death suit was futile and that it should be dismissed. That same day, Jennifer called adjuster Nita Cox, Perkins’s replacement, and asked why she had not received her lump-sum payment.
 
 [2]
 
 According to Am-Fed, that was the first time it had any notice that Jennifer had obtained a lump-sum order. During that conversation, Jennifer also notified Cox that she had remarried in August 2002. As a result, AmFed terminated Jennifer’s widow’s benefits.
 

 ¶ 7. Three days later, Jennifer called Cox again. Cox reported that she had been unable to obtain the lump-sum order. On April 16, 2003, attorney T.G. Bolen, representing AmFed, wrote a letter to Cox and attached a copy of the lump-sum order to that letter. However, Cox was on her honeymoon and was out of the office at that time. Cox did not return to the office until April 30, 2003.
 

 ¶ 8. When Cox returned from her honeymoon, she discussed the order with her
 
 *1181
 
 supervisor, Bob Blaekledge, and then asked Bolen to contact the Commission to obtain a calculation of benefits that Jennifer was due. Cox followed up with Bolen on May 5th and May 12th, but there was no new information. On May 16, 2008, Bolen told Cox that he had written a draft of a letter to the Commission regarding Jennifer’s calculation, but he wanted to discuss it with her before he sent it. Bo-len then revealed that he had discovered Stuart’s initial error in setting up Jennifer and the children’s bi-weekly deferred payments and that, as a result, Jennifer and the children had been receiving one-half of the benefits to which they had been entitled.
 

 ¶ 9. On May 27, 2003, Bolen wrote a letter to the Commission. Bolen requested a calculation of benefits. He also reported that AmFed became aware of the order only when Jennifer called and asked about it. Finally, Bolen stated that Am-Fed was prepared to forward the value of the order immediately after receiving the Commission’s calculation of benefits.
 

 ¶ 10. On May 29, 2003, attorney William H. Jones filed Jennifer’s complaint for bad faith. Jennifer claimed that AmFed acted in bad faith regarding payment of her benefits. Incidentally, on the same day, the Commission issued its calculation of benefits, including interest, owed to Jennifer and the children. The Commission calculated that AmFed owed Jennifer approximately $72,000. As for James’s three children, the Commission calculated that AmFed owed each of the two minor children approximately $3,500.
 
 [3]
 
 On May 30, 2003, the Commission mailed its calculation to Bolen.
 

 ¶ 11. On June 10, 2003, Bolen faxed the Commission’s calculation to AmFed. On June 26, 2003, seventy-six days after Jennifer first notified AmFed of her order, Bolen sent Jones a letter and three checks. One check represented the amount due to Jennifer. The other two checks represented the amounts that were owed to the children. In his letter, Bolen explained the error in setting up the bi-weekly payments. Bolen also explained that the checks to the children were intended to correct the mistake. Until then, Jennifer was unaware of the under payments.
 

 ¶ 12. On July 7, 2003, Jones wrote back to Bolen. Jones requested that AmFed pay Jennifer and the children a 10% penalty for late payment as set forth in Mississippi Code Annotated section 71-3-37(5) (Rev.2000). Having received no response, Jones sent a second later to Bolen on July 21, 2003, and a third letter on August 1, 2003.
 

 ¶ 13. On August 4, 2003, Bolen responded to Jones. Bolen reported that he had been and was continuing to locate an order from the Commission regarding whether penalties were allowed. Bolen also noted that “the calculation by the Commission’s statistician did not include the penalty.” According to Bolen, the Commission’s failure to include a penalty “raises the question as to whether [penalties] were due.”
 

 ¶ 14. Bolen wrote another letter to Jones on August 8, 2003. Bolen reported that AmFed agreed to pay a penalty, but due to an error in listing the payee’s name, Bolen had requested that AmFed reissue the cheek. Bolen finally sent Jones the penalty payment on August 13, 2003. Bo-len sent Jones a check for approximately $17,808.35. That figure represented a 20% penalty pursuant to Mississippi Code Annotated section 71-3-37(6) (Rev.2000), as opposed to the 10% penalty Jones had
 
 *1182
 
 requested. Bolen stated that, unless Jones took issue with his analysis of the penalty, he would “consider this aspect of the claim closed and[,] of coursef,] the ongoing weekly benefits will continue to the minor children as required by the statute.”
 

 ¶ 15. Over two months later, Jennifer amended her initial complaint. Jennifer raised additional claims on behalf of the children. She also claimed AmFed acted in bad faith regarding the mistake involved with setting up the deferred bi-weekly benefits paid between May 4, 2001, and August 8, 2008.
 

 ¶ 16. On March 5, 2007, the parties went to trial. The proceedings were bifurcated as follows: (1) compensatory-damages phase and (2) punitive-damages phase. AmFed unsuccessfully requested a directed verdict after Jennifer presented her case-in-chief. After the compensatory-damages phase of the bifurcated proceedings, the jury returned a verdict for Jennifer and awarded Jennifer $130,568 in compensatory damages.
 

 ¶ 17. Jennifer then moved to submit the punitive damages issue to the jury. Over AmFed’s objection, the circuit court granted Jennifer’s motion. After deliberating, the jury awarded Jennifer $200,000 in punitive damages. In total, the jury awarded Jennifer $330,568 in damages.
 

 ¶ 18. Post-trial, AmFed moved to set off the jury’s awards by the amounts Am-Fed paid when it tendered the award and the 20% penalty. Additionally, Jennifer filed a post-trial motion for attorney’s fees. The circuit court granted both motions, set off the amounts previously paid by Am-Fed, and ordered AmFed to pay Jennifer $32,500 in attorney’s fees.
 

 ¶ 19. On July 30, 2007, the circuit court entered a final judgment of approximately $266,500 for Jennifer. AmFed filed unsuccessful post-trial motions for a judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial. Aggrieved, AmFed appeals. AmFed claims that the evidence was insufficient to find that it acted in bad faith at any point in resolving Jennifer’s claims. AmFed also claims that the circuit court erred when it submitted the punitive damages issue to the jury.
 

 ANALYSIS
 

 I. SUFFICIENCY OF THE EVIDENCE
 

 ¶ 20. AmFed argues that the jury’s verdict was not supported by sufficient evidence. Stated differently, AmFed claims that there was insufficient evidence that Jennifer was entitled to recover any damages based on its conduct. “The standard of review for the denial of a motion for directed verdict and a motion for judgment notwithstanding the verdict are identical.” Miss.
 
 Power and Light Co. v. Cook,
 
 832 So.2d 474, 478(¶ 6) (Miss.2002). The Mississippi Supreme Court has described the standard as follows:
 

 This Court will consider the evidence in [the] light most favorable to the appel-lee, giving the appellee the benefit of all favorable inferences that may be reasonably drawn from the evidence. If the facts are so overwhelmingly in favor of the appellant that reasonable jurors could not have arrived at a contrary verdict, this Court must reverse and render. On the other hand, if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, this Court must affirm.
 

 Id.,
 
 (internal citations omitted).
 

 We address the jury’s award of punitive damages in issue II. For brevity’s sake,
 
 *1183
 
 our analysis will first focus on the jury’s award of compensatory damages.
 

 ¶ 21. The Mississippi Workers’ Compensation Law sets forth that workers’ compensation benefits are the exclusive remedy available to an employee who suffers an injury that arises out of and in the course of employment. Miss.Code Ann. § 71-3-9 (Rev.2000). However, the exclusive remedy provision does not bar a common law tort action against an insurance carrier if the carrier commits an intentional tort independent of the compen-sable accident.
 
 Pilate v. Am. Federated Ins. Co.,
 
 865 So.2d 387, 391(¶ 22) (Miss.Ct.App.2004) (citing
 
 Southern Farm Bureau Cas. Ins. Co. v. Holland,
 
 469 So.2d 55, 58-59 (Miss.1984)).
 

 ¶ 22. To demonstrate bad faith, Jennifer was obligated to prove three essential elements: “(1) a contract of workers’ compensation insurance existed between the defendant and the plaintiffs employer; (2) the earner denied the plaintiffs compensa-ble workers’ compensation claim without a legitimate or arguable reason; and (3) the denial of benefits constitutes a willful and intentional or malicious wrong.”
 
 Rogers v. Hartford Accident & Indem,. Co.,
 
 133 F.3d 309, 312 (5th Cir.1998) (citations omitted). The parties stipulate that there was a contract of workers’ compensation insurance between James and AmFed through James’s employer at the time James was electrocuted and died during the course and scope of his employment. Consequently, there is no dispute that there was sufficient evidence of the first element.
 

 ¶ 23. As for the second element, whether AmFed denied Jennifer’s claim without a legitimate or arguable reason, it is undisputed that AmFed never denied any of Jennifer’s claims. Jennifer’s claims are based on the concept that AmFed’s
 
 delay
 
 in resolving her claims constituted bad faith. An unreasonable delay in resolving a claim can qualify as recoverable bad faith.
 
 See, e.g., Travelers Indem. Co. v. Wetherbee,
 
 368 So.2d 829, 835 (Miss.1979). Mississippi Code Annotated section 71-3-37(1) (Rev.2000) sets forth that “[cjompensation ... shall be paid ... promptly.” Additionally, “Mississippi law imposes a duty upon insurers to ‘conduct a reasonably prompt investigation of all relevant facts.’ ”
 
 Pilate,
 
 865 So.2d at 393(¶ 31) (quoting
 
 Bankers Life and Cas. Co. v. Crenshaw,
 
 483 So.2d 254, 276 (Miss.1985)). Accordingly, the issue that follows is whether there was sufficient evidence that AmFed delayed payment of Jennifer’s claims without a legitimate or arguable reason.
 

 ¶ 24. James died at work. On June 5, 2001, Jennifer personally filed an “application for payment” form with the Commission. That same day, Commissioners Ben Barrett Smith and Barney Schoby executed an order authorizing that “a full payment be paid immediately” to Jennifer. JoAnn McDonald, former Commission Secretary, testified that it was common practice to forward an executed lump-sum order to an insurer. However, McDonald could not testify that the Commission specifically forwarded Jennifer’s lump-sum order to AmFed. There is no evidence that AmFed actually received Jennifer’s lump-sum order at that time.
 

 ¶ 25. On September 11, 2002, AmFed received a letter from the Commission indicating that AmFed had previously been asked to advise the Commission regarding the status of Jennifer’s claim. The Commission also indicated that the letter was the Commission’s second and final request that AmFed file a form designated as B-31 regarding Jennifer’s claim.
 
 [4]
 
 While that
 
 *1184
 
 letter likely should have aroused AmFed’s curiosity, the Commission’s September 2002 letter did not directly put AmFed on notice that Jennifer had obtained a lump-sum order.
 

 ¶ 26. Jennifer personally notified Am-Fed that she had obtained a lump-sum order when she called Cox on April 11, 2003. Cox did not attempt to obtain a copy of Jennifer’s lump-sum order. Cox did not call the Commission to verify the existence of the lump-sum order. Instead, Cox asked Bolen to investigate the matter. Five days later, Bolen notified AmFed that he had confirmed that Jennifer had indeed obtained a lump-sum order. Cox was out of the office, so she did not receive Bolen’s confirmation. Even so, Cox’s supervisor, Blackledge, testified that he was aware of Bolen’s confirmation. Rather than move Jennifer’s claim along, Blackledge did nothing; opting instead to wait for Cox to handle it when she returned from her two-week honeymoon.
 

 ¶ 27. When Cox returned to work two weeks later, Cox again handed over an administrative task to Bolen. That is, rather than personally requesting that the Commission issue a calculation of benefits due to Jennifer per her lump-sum order, Cox asked Bolen to request a calculation. It took approximately one month for Bolen to make that request. The Commission fulfilled Bolen’s request and mailed the calculation to Bolen two days after Bolen requested it. Bolen forwarded the calculation to AmFed on June 10, 2003. Bolen later testified that he did not forward it as soon as he received it. Instead, he waited until after he returned from his vacation. On June 26, 2003, an additional sixteen days after AmFed received the Commission’s calculation, Bolen finally mailed Jennifer the balance of the lump-sum order.
 

 ¶ 28. To summarize, AmFed had verification that the lump-sum order existed five days after Jennifer’s notification. For two weeks, nothing happened because Black-ledge was content to let Cox handle matters upon her return. AmFed then asked Bolen to request a calculation. Approximately one month later, Bolen mailed the request. The Commission returned the calculation two days after Bolen requested it. Bolen did not forward the calculation to AmFed at that time. Instead, he went on vacation. He finally forwarded the calculation approximately ten days later. It took more than two weeks for AmFed to prepare checks based on the calculation, get them to Bolen, and for Bolen to mail them to Jennifer’s attorney. From the time Jennifer notified AmFed of her lump-sum order, it took seventy-six days — approximately eleven weeks — for AmFed to pay her the benefits she was due.
 

 ¶ 29. There is evidence that could have served as a form of mitigation of AmFed’s investigation. While investigating Jennifer’s claim that she had a lump-sum order, Bolen discovered that AmFed had been paying one-half of the weekly benefits that Jennifer and the children were due. Am-Fed processed that error at the same time that it processed Jennifer’s lump-sum order. While that is commendable, the jury could have found that it was not necessary to delay Jennifer’s lump-sum order to investigate the error in weekly deferred compensation.
 

 ¶ 30. AmFed argues that it was entitled to rely on Bolen’s advice. “Generally, a client’s reliance upon advice of his
 
 *1185
 
 attorney prevents a finding of bad faith.”
 
 Liberty Mut. Ins. Co. v. McKneely,
 
 862 So.2d 530, 536(¶ 18) (Miss.2003). Here, there was no evidence that AmFed’s delay was based upon Bolen’s advice. Instead, AmFed abdicated its investigation to Bolen and relied on him solely to perform the administrative functions of verifying that a lump-sum order existed and requesting a calculation of benefits. AmFed’s own written policy stated that “file abandonment to defense counsel is unacceptable.”
 

 ¶ 31. The
 
 jury did not
 
 specify what part of AmFed’s conduct necessitated compensating Jennifer. However, there was sufficient evidence that, based on the totality of circumstances involved in processing Jennifer’s lump-sum order, AmFed’s conduct was the equivalent of an unreasonably delayed investigation with no legitimate or arguable reason for the delays.
 

 ¶ 32. That is not the end of our analysis, however. As stated above, the third element of a bad-faith claim is that the denial or delay of benefits constitutes a willful and intentional or malicious wrong.
 
 Rogers,
 
 133 F.3d at 312. The Mississippi Supreme Court has held that a plaintiff may prevail in a bad-faith claim against an insurer by demonstrating that the insurer “acted with gross and reckless disregard for the insured’s rights.”
 
 McKneely,
 
 862 So.2d at 533(¶ 9) (citations omitted). “Reckless is defined as ... careless, heedless, inattentive; indifferent to consequences.” Tur
 
 ner v. City of Ruleville,
 
 735 So.2d 226, 229(¶ 15) (Miss.1999) (internal quotations omitted). “For conduct to be ‘reckless’ it must be such as to evince disregard of, or indifference to, consequences.”
 
 Id.
 

 ¶ 33. Cox handed off the administrative task of verifying the existence of the lump-sum order to Bolen, rather than simply calling the Commission herself. Black-ledge knew about the lump-sum order after Bolen verified that it existed. Black-ledge did nothing. He waited for Cox to handle it after she returned from her two-week honeymoon. When Cox returned, once again she simply delegated an administrative task to Bolen instead of personally requesting a calculation. One month later, Bolen requested the calculation. The Commission returned the calculation two days later, but Bolen did not forward it to AmFed. Instead, Bolen went on vacation. After he returned, he finally forwarded the Commission’s calculation to AmFed. Sixteen days later, Bolen had obtained checks from AmFed and could finally mail Jennifer’s lump-sum payment to Jennifer’s attorney.
 

 ¶ 34. Through Jennifer, AmFed was aware that Jennifer’s family was suffering financially. Jennifer informed AmFed that her new husband was not working because his ex-wife had been killed in a car wreck and one of her husband’s children suffered two broken legs and a head injury. That injured child required constant care. While none of those tribulations were the fault of AmFed, the jury could have found that AmFed’s habitually delayed “investigation” involving intentional choices to pass along duties was in reckless disregard of the consequences that Jennifer faced based on AmFed’s failure to resolve her lump-sum order.
 

 ¶ 35. The jury could have reasonably found that Jennifer presented sufficient evidence that AmFed acted in bad faith. Though the jury might have been justified in reaching an alternative verdict, resolution of such close factual questions is within the province of the jury. Accordingly, we find that the circuit court did not commit reversible error when it overruled Am-Fed’s challenges to the sufficiency of the evidence.
 

 II. JURY INSTRUCTIONS ON COMPENSATORY DAMAGES
 

 
 *1186
 
 ¶ 36. AmFed claims the circuit court erred in instructing the jury. The Mississippi Supreme Court has stated the appropriate standard of review as follows:
 

 There are several standards of review that must be used in analyzing the issues in this appeal. First, when reviewing jury instructions on appeal, we must read them as a whole. While a party is entitled to have jury instructions submitted that represent his or her theory of the case, an instruction that incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence need not be submitted to the jury. This Court will not find reversible error where the instructions actually given, when read together as a whole, fairly announce the law of the ease and create no injustice.
 

 Entergy Miss., Inc. v. Bolden,
 
 854 So.2d 1051, 1054(¶ 6) (Miss.2003) (internal citations and quotations omitted). AmFed raises claims regarding six instructions that were accepted during the compensatory-damages phase of the bifurcated proceedings. We analyze each instruction in turn.
 

 A. Instructions P-1 and P-12
 

 ¶ 37. AmFed claims instructions P-1 and P-12 peremptorily instructed the jury to return a verdict for Jennifer for Jennifer’s “lump-sum plus the penalty and the deficiency in the payment of the children’s benefits plus the penalties, even though these claims were unquestionably paid some four years prior to the trial.” AmFed submits that instruction P-1 appears on page 390 of the court record. However, we have reviewed the record and have been unable to locate instruction P-1 on page 390 or any other place in the record. AmFed was obligated to present a record sufficient to demonstrate its allegations.
 
 Clayton v. State,
 
 822 So.2d 1141, 1145(¶ 16) (Miss.Ct.App.2002). Having failed to do so, AmFed’s argument is procedurally barred.
 

 ¶ 38. Instruction P-12 states:
 

 The Court instructs the jury that Jennifer ... sought and requested declaratory judgment that her minor children were entitled to the unpaid weekly installments together with the ten percent (10%) penalty as provided by law and the Court does hereby grant and award unto Jennifer ... such declaratory judgment. The Court therefore instructs you to find for the minor children in this proceeding in the amount of $3,493.06 for each child respectively, together with the ten percent (10%) penalty of $349.31 for each child.
 

 ¶ 39. We find no error in the circuit court’s decision to grant instruction P-12. Although there was evidence that AmFed had paid each of the children $3,493.06 prior to trial, AmFed experienced no prejudice as a result of this instruction. The jury was aware that AmFed had paid those amounts, and the circuit court reduced the final judgment by those amounts. Additionally, AmFed had not paid the 10% penalties to each of the children. Accordingly, we find no merit to AmFed’s complaints regarding jury instructions P-1 and P-12.
 

 B. Instruction P-2
 

 ¶ 40. Instruction P-2 states:
 

 The Court instructs the jury that the purpose of the Mississippi Workers’ Compensation Act is to facilitate payment of compensation to an injured worker, or in the event of the death of the worker to his widow and children without delay and without unnecessary costs.
 

 The purpose of this Act is to relieve society and the public of the burden of having to support children and widows
 
 *1187
 
 who have been left without means of support because of the death of the worker in an industrial accident.
 

 According to AmFed, instruction P-2 “is an abstract statement, not related to the issues and the facts of the case, which was likely to and did confuse and mislead the jury by leaving the impression that Amfed in some way [had] violated the Act.”
 

 ¶ 41. However, AmFed does not state specifically how the jury was misled into believing that AmFed violated the Workers’ Compensation Law. Additionally, there is legal support for the statements contained in instruction P-2. “[T]he purpose of the Act is to facilitate the payment of compensation without delay and without unnecessary cost.”
 
 H.C. Moody & Sons v. Dedeaux,
 
 223 Miss. 832, 842-43, 79 So.2d 225, 228 (1955). “One of the primary purposes of the Workmen’s Compensation Act is to relieve society of the burden of supporting in orphanages or public almshouses helpless children, who have been left without means of support because of the death of the wage earners who have lost their lives in industrial accidents.”
 
 Stanley v. McLendon,
 
 220 Miss. 192, 199, 70 So.2d 323, 326 (1954). It follows that we find no merit to AmFed’s claims regarding instruction P-2.
 

 C. Instruction P-3
 

 ¶ 42. Instruction P-3 reads:
 

 The Court instructs the jury that in this case, AmFed Companies, LLC and its employees were the agent of American Federated Insurance Company. That these employees were acting within the scope of their employment and as agents for American Federated Insurance Company during their handling of the claim for workers’ compensation benefits in this proceeding.
 

 The Court further instructs the jury that AmFed Companies, LLC and American Federated Insurance Company are jointly and severally liable for any damages you may determine are appropriate to be awarded unto Plaintiffs consistent with the other jury instructions given to you in this case.
 

 ¶ 43. AmFed laments that instruction P-3 “is erroneous because it purports to impute the acts of Amfed Companies LLC to American Federated Insurance Company on the theory that Amfed Companies LLC acted as its agent and is an incorrect statement of law applicable to cases alleging bad faith.” AmFed cites no authority for its argument that instruction P-3 is an incorrect statement of law or that the substantive portion of the instruction is somehow incorrect. Arguments advanced on appeal must “contain the contentions of the appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.” M.R.A.P. 28(a)(6). Failure to comply with M.R.A.P. 28(a)(6) renders an argument procedurally barred. Consequently, we find that this issue is procedurally barred.
 

 D. Instruction P-6
 

 ¶ 44. Instruction P-6 states:
 

 The Court instructs the jury that if you believe from a preponderance of the evidence that Jennifer ... is entitled to a verdict against the Defendants for compensatory damages, it will be your duty to award her such damages as will completely compensate her reasonably for all detriment suffered by her, and of which the Defendants conduct was the proximate cause. In arriving at the amount of the award, you shall compensate her reasonably for any fears, anxiety, or other mental or emotional distress, including economic distress or loses [sic] resulting therefrom, if any, suffered by her, and proximately result
 
 *1188
 
 ing from the conduct of the Defendants in this case consistent with the other instructions of the Court.
 

 ¶ 45. AmFed raises two complaints regarding jury instruction P-6. First, Am-Fed claims it is an incorrect statement of law because it states that, upon returning a verdict for Jennifer, the jury was to award damages “which will completely compensate her reasonably for all detriment suffered by her.” AmFed does not specify why that statement is an incorrect statement of law. Additionally, AmFed omits the fact that the instruction stated that the jury was to award damages that were proximately caused by AmFed’s conduct. Instruction P-6 also qualified the particular types of damages that the jury could assess against AmFed.
 

 ¶ 46. Second, AmFed complains that instruction P-6 peremptorily instructs the jury to award damages for “fears,” “anxiety,” and “economic distress or losses” “without informing the jury what these terms mean and what facts are necessary to support them.” Be that as it may, jury instruction D-8a reads as follows:
 

 Under the laws of this state, the terms mental anguish and emotional distress are synonymous and used interchangeably to describe the same condition. A Defendant is not liable for compensatory damages on a claim for mental anguish or emotional distress without proof of physical or emotional injury for acts resulting from or caused by a mistake, clerical error or negligence. However, a plaintiff may recover compensatory damages without proof of an actual injury if the defendant’s conduct or behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless, evokes outrage and revulsion and is committed for the purpose of causing harm to the plaintiff. Furthermore, the damages resulting from the conduct or behavior must have been reasonably foreseeable by the defendant at the time the acts were committed. Otherwise, a plaintiff is not entitled to recover compensatory damages for mental anguish or emotional distress without proof of an actual physical or emotional injury.
 

 “This Court will not find reversible error where the instructions actually given, when read together as a whole, fairly announce the law of the case and create no injustice.”
 
 Entergy Miss., Inc.,
 
 854 So.2d at 1054(¶ 6). Accordingly, we find no merit to this issue.
 

 E. Instruction P-8
 

 ¶ 47. Instruction P-8 states:
 

 The Court instructs the jury that damages is the word which express in dollars and cents the injuries sustained by the Plaintiffs. You are the sole judges as to the measure of damages to be assessed; there is no fixed rule. You may consider the full measure of all damages reasonably foreseeable by the failure of the Defendants to pay the workers’ compensation benefits, including that amount owed under the Lump-sum Order of the Workers’ Compensation Commission.
 

 Reasonably foreseeable damages include anxiety and emotional distress, especially in the area of insurance where the loss of a loved one is exacerbated by the attendant financial effects of that loss. Also to be considered is the additional inconvenience and expense incurred in the effort to have the nonpayment or underpayment corrected.
 

 In determining the amount of damages to be awarded as may be shown by a preponderance of the evidence, you may award damages for the following: the type of injuries to the Plaintiffs, if any; past mental anguish, if any; anxiety or emotional distress caused to the Plain
 
 *1189
 
 tiff, if any, and additional inconvenience and expense, if any.
 

 ¶ 48. AmFed’s first complaint is that instruction P-8 instructed the jury that it could consider AmFed’s failure to pay the amount pursuant to the lump-sum order. We addressed a similar complaint under the analysis of instruction P-12. Suffice it to say, we find no error to this complaint.
 

 ¶ 49. AmFed’s second complaint is that portions of instruction P-8 “serve[d] no other purpose other than to inflame and prejudice the jury against the [sic] Amfed by further suggesting that the contractual claims had not been paid ... and completely disregards the fact that Amfed had been paying biweekly benefits since [James’s] death.” AmFed did not raise this issue at trial. When the circuit court first considered instruction P-8, counsel for AmFed stated that he had “a problem with the last sentence of that, past, present and future mental anguish.” The circuit court instructed Jennifer’s attorney to revise instruction P-8. The next morning, Jennifer’s attorney presented the instruction in the form that appears above. AmFed’s attorney stated that “in all the cases I’ve read I’ve never seen financial effects of a loss. I don’t think this is the law on damages in this case. And we think it is, as a matter of law, incorrect.” AmFed’s attorneys never claimed that instruction P-8 inflamed and prejudiced the jury. “Appellate courts may not rule upon material matters which the trial judge did not have the opportunity to judge.”
 
 Johnson v. Alcorn State Univ.,
 
 929 So.2d 398, 407(¶ 31) (Miss.Ct.App.2006). Accordingly, AmFed is procedurally barred from raising is allegation on appeal.
 

 ¶ 50. Finally, AmFed argues that instruction P-8 did not “define what additional inconvenience and expense means and [did] not give the jury any guidelines for making an award for [them] even if they are valid elements of damage.” Again, AmFed did not raise this objection at trial, and it is procedurally barred from raising it on appeal.
 
 Id.
 

 III. PUNITIVE DAMAGES
 

 ¶ 51. After the jury awarded Jennifer compensatory damages, Jennifer moved to submit the issue of punitive damages to the jury. The circuit court granted Jennifer’s motion. Jennifer did not present any additional evidence during the punitive-damages portion of the bifurcated proceedings. After some discussion regarding jury instructions, the circuit court announced that it was “not going to even look at any more instructions from [defense counsel].” The circuit court then had the jury brought back into the courtroom and stated the following:
 

 Members of the jury, you’re back here at this time. The Court is going to make a statement as clear as I can to you as to why you are here.
 

 You found in favor of the plaintiff this morning. There is [sic] some questions as to whether or not, even though you have made a finding that these people are entitled to a compensatory award, you’ve made that finding.
 

 There should be an instruction here, I don’t have one and they’ve not submitted one, whereby the instruction would say to you this — I haven’t had one prepared and I don’t — do /all have an instruction on that anywhere on why the jury is entitled to consider punitive damages or you want me to give them an oral instruction? I don’t have one, and I don’t have anyone here that can type one up.
 

 [DEFENSE COUNSEL]: If it please the Court, an oral instruction would be fine.
 

 [PLAINTIFF’S COUNSEL]: Judge, we have one, but oral — ■
 

 
 *1190
 
 THE COURT: Let me see it. I’ll go ahead and be explaining to you what it’s for. In a case like this there’s been some testimony about the conduct of these people, how they handled this case. You’re very familiar with that. I’m sure you have considered that.
 

 Where you have conduct where it’s questionable as to whether or not it was done in a way that would be satisfactory to the community or to the general public, you have a right to consider whether or not in their handling, the way they handled the case and the way this case came about and the question came up as to whether or not it was sufficiently handled, in accordance with what you’ve already found in a compensatory manner, as to whether or not the way the case was handled that the people should be punished, not for the sake of giving these people a lot of money or whatever, but for the purpose of protecting the public so that if they have done something wrong this would deter them from doing the same thing in the future to other people in the community, other people in society that might be having a problem like this.
 

 Do you understand what I’m saying? You all heard about what punitive damages [are]. You can’t put a corporation or an insurance company in jail. The only way you can affect the outcome or control their conduct, if that’s what you should decide you should do, is by penalizing their pocketbook.
 

 Does that sound simple enough? They say they have an instruction. I thought they did. I’m not going to try to delay this trial and go try to type one up now. It’s the Court’s responsibility to instruct you, but the lawyers usually bring that law for me to do that.[
 
 5
 
 ]
 

 All right. Here it is. I’ll read it to you.
 

 The Court instructs the jury that punitive damages are added damages awarded to the plaintiff, such as Jennifer Brown Jordan, for public service in bringing a wrongdoer into account or an example to warn and deter others from repeating the same act. They are never awarded to benefit the injured party as a matter of right, but rather to punish and compel the wrongdoer to have due and proper regard for the rights of the public. In an action for breach of contract, such as the one here, punitive damages are appropriate only when the breach is intended [sic] by intentional wrong, insult, abuse, gross negligence or wanton disregard for the rights of the injured.
 

 Punitive damages are only appropriate when the insurer has acted with malice or gross negligence or reckless disregard for the insured’s right. A clerical error, [sic] honest mistake does not give the [sic] rise to punitive damage.
 

 If you find from a preponderance of the evidence in this case that the acts of the defendants were grossly negligent, attended by intentional wrong, insult, abuse or evidenced a wrong or wanton, willful disregard for the rights of the public, then you shall find for the plaintiff on the issue of punitive damages.
 

 (Footnote added).
 

 According to AmFed, the circuit court erred when it instructed the jury that it
 
 *1191
 
 could award punitive damages based on a preponderance of the evidence standard of proof. We agree.
 

 ¶ 52. Pursuant to Mississippi Code Annotated section 11 — 1—65(l)(a) (Rev.2002), “[pjunitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant ... acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.” By instructing the jury that it could award punitive damages pursuant to a preponderance-of-evidence standard, the circuit court’s instruction relaxed the necessary burden of proof. Accordingly, the circuit court committed a clear error of law.
 

 ¶ 53. Consequently, we must reverse the jury’s award of punitive damages and remand this matter to the circuit court for a new trial on punitive damages. We are aware that neither party presented evidence at the original hearing on punitive damages and that such presentation of evidence will likely be necessary on remand. To be clear, we do not disturb the circuit court’s decision to submit the issue of punitive damages to the jury. Additionally, this opinion should not be construed as a finding that Jennifer’s request for punitive damages must be based singularly on the facts and allegations discussed in Issue I. Issue I pertained only to whether the jury heard sufficient evidence to find that Am-Fed acted in bad faith. This opinion should not be interpreted as holding that Jennifer could have
 
 only
 
 demonstrated bad faith through a presentation of those facts discussed in Issue I. Accordingly, to attempt to demonstrate entitlement to punitive damages, Jennifer may offer proof of all facts that were offered in the first portion of the bifurcated proceedings. We merely find that the circuit court improperly instructed the jury on the correct burden of proof necessary to return an award of punitive damages.
 

 ¶ 54. THE JUDGMENT OF THE JONES COUNTY CIRCUIT COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANTS AND APPELLEE.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND MAXWELL, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.
 

 [1]
 

 . Although it was not named in the suit, in July 2002, A & B Electric and AmFed hired attorney T.G. Bolen to pursue their potential subrogation rights in Jennifer’s wrongful-death suit.
 

 [2]
 

 . Jennifer testified that "the way [shej understood it was [she] was not going to get [the lump-sum payment] until the third-party lawsuit was over.”
 

 [3]
 

 . The Commission concluded that one of James’s children was not entitled to any benefits because, due to his age, he was ineligible to receive benefits.
 

 [4]
 

 . According to McDonald’s testimony:
 

 [t]he B-31 is a notice of final payment.
 
 *1184
 
 And that is a form where the — if a judge dismisses a case, then the attorney representing — well, the insurance company will send in this form, which is the B-31 indi-eating that payments have been paid or not paid, but that form usually closes a file. And a B-31 is also filed for lump-sum settlements and for compromise settlements.
 

 [5]
 

 . "At least twenty-four hours prior to trial each of the attorneys must number and file the attorney’s jury instructions with the clerk, serving all other attorneys with copies of the instructions.” URCCC 3.07. "The court’s instructions must be in writing.”
 
 Id.
 
 "All instructions will be read by the court in whatever order the court chooses, will be available for the attorneys during their arguments, and
 
 will
 
 be carried by the jury into the jury room when they retire to consider their verdict.”
 
 Id.
 
 (emphasis added).