# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00091-COA

**LIBERTY INSURANCE CORPORATION**                    **APPELLANT**

**v.**

**ANTHONY LEE TUTOR**                                       **APPELLEE**

DATE OF JUDGMENT:                  08/21/2017
TRIAL JUDGE:                             HON. LEE SORRELS COLEMAN
COURT FROM WHICH APPEALED:    CLAY COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:       CLIFFORD KAVANAUGH BAILEY III
                                                GREGG A. CARAWAY
ATTORNEYS FOR APPELLEE:        LANCE L. STEVENS
                                                RODERICK D. WARD III
NATURE OF THE CASE:               CIVIL - INSURANCE
DISPOSITION:                          REVERSED AND RENDERED - 10/29/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.    Anthony Lee Tutor filed a complaint against Liberty Insurance Corporation (Liberty); United Parcel Service Company and United Parcel Service Inc. (collectively UPS); UPS business manager April Dallas; and UPS supervisor Bonnie King seeking extra-contractual compensatory damages and punitive damages for the alleged bad-faith handling of Tutor's prior workers' compensation claim.

¶2.    After a trial on the matter, the jury awarded Tutor extra-contractual damages in the amount of $100,000. The jury also returned a verdict finding in favor of Tutor on his claim for punitive damages, but the jury did not assess a monetary award against Liberty for

punitive damages. After the trial, UPS and Tutor reached a confidential settlement of Tutor's claim against UPS. UPS is not a party in this appeal.

¶3. Liberty now appeals, arguing that the evidence presented at trial was insufficient to support the jury's verdict that Liberty is liable to Tutor for extra-contractual damages and that the evidence was insufficient to support the punitive damages award. Liberty also argues that the trial court erred in admitting Lydia Quarles's expert testimony.

¶4. We find that in applying precedent to this case, Tutor failed to meet his burden to prove extra-contractual damages because the record reflects that Liberty possessed an arguable good-faith basis for its delay in paying Tutor's claim.[1] Accordingly, the evidence presented at trial was insufficient to support the jury's verdict. We therefore reverse the jury's verdict and render a verdict in favor of Liberty.

**FACTS**

¶5. Tutor worked as a package driver for UPS. At the time, Liberty was the workers' compensation carrier for UPS. On September 1, 2011, Tutor injured his back while walking upstairs to deliver a package.

¶6. After the injury occurred, Tutor immediately called his UPS business manager, April Dallas, and informed her that he injured his back and would not be able to finish his route. Dallas advised Tutor that she would bring another UPS supervisor Gary Bishop to meet Tutor and help him with the remainder of his route. Dallas also advised Tutor to call her when he returned to the UPS facility.

---

[1] *See United Servs. Auto. Ass'n (USSA) v. Lisanby*, 47 So. 3d 1172, 1178 (¶18) (Miss. 2010).

¶7.     When Bishop and Tutor returned to the Columbus facility that evening, they called Dallas to discuss what happened.  During the phone call, Bishop and Tutor informed Dallas about the circumstances regarding Tutor's injury—that Tutor was carrying a box up some stairs to make a delivery when a dog startled him and he twisted and hurt his back.[2]  Dallas advised Tutor to seek medical treatment and informed him that due to the late hour, he would need to go to the emergency room because medical clinics would be closed.  Tutor told Dallas that he would prefer to seek treatment from his personal physician the next day.  Tutor also told Dallas that prior to this injury, he had been receiving treatment from a chiropractor.  Dallas testified that based on this second phone conversation with Tutor, she determined that Tutor was suffering from a previous injury and that the injury he suffered after the dog startled him was not work related.  As a result, Dallas did not report Tutor's injury to Liberty.

¶8.     The record contains extensive medical evidence from various physicians regarding Tutor's injury as well as evidence of the medical treatment Tutor received for back pain he suffered prior to this injury.  On September 2, 2011, the day after his injury, Tutor sought treatment from his family-medicine doctor, Dr. Brad Crosswhite.  At his appointment, Tutor informed Dr. Crosswhite that he sustained back pain "when he was walking up a flight of stairs . . . while he was carrying a box and heard a dog bark and he twisted his back[,] immediately feeling pain in his back."  Dr. Crosswhite also noted that Tutor "is seeing a

_____

[2] There is conflicting testimony regarding whether Tutor told Dallas what happened or Bishop repeated to Dallas what Tutor had told him.

3

chiropractor weekly for [a] problem in the same spot in this thoracic vertebrae."[3] Dr. Crosswhite referred Tutor to receive an MRI of his thoracic spine and recommended that Tutor stay off of work from September 15–30, 2011.

¶9. Despite Tutor's complaint of back pain, the MRI results revealed no objective injury. Dr. Crosswhite testified that the MRI results were normal and that "the only thing out of the normal" on the MRI results were degenerative changes to Tutor's thoracic spine. Dr. Crosswhite explained that "degenerative" means "wear or tear or arthritic changes."[4] Dr. Crosswhite clarified that "[t]here is no objective finding anatomically on this MRI that . . . would explain the cause of [Tutor's] pain or the degree of his pain." Dr. Crosswhite cautioned, however, that "MRI findings are not always consistent with a patient's physical

---

[3] However, Dr. Crosswhite's records from Tutor's January 16, 2012 appointment reflect that Tutor "[s]ays he was previously seeing a chiropractor but for different type of back pain."

[4] The record reflects that Tutor received an MRI of his thoracic spine on September 2, 2011. The MRI findings show the following:

Findings: Normal alignment. Vertebra have normal height and signal except for an incidentally noted T6 hemangioma and a few tiny lower thoracic degenerative Schmorl's nodes within the endplates. Lower thoracic disc degeneration is mild. Thoracic cord signal is normal. Is no disc herniation, canal stenosis, or neural foraminal stenosis.

Impression: Negative thoracic spine MRI other than minimal lower thoracic disc degeneration and degenerative endplate change.

(Dr. Crosswhite's records from Tutor's November 2, 2011 visit also reflect that Tutor's MRI results were "normal.") The record reflects that Tutor continued receiving treatment from Dr. Crosswhite for his back pain.

4

complaints."[5]

¶10.    Tutor testified that he attempted to return to work on September 6, 2011 and September 12, 2011, shortly after his injury, but he was unable to work due to his back pain. Tutor testified that on approximately September 15, he received a call from Dallas. According to Tutor, Dallas informed him that he was not going to be able to continue working partial days. Instead, Tutor would either have to come back to work full time or file for short-term disability. Tutor testified that he told Dallas that "you and I both know this should be [workers' compensation]." Tutor said that Dallas responded, "No, this is previous injury," and she again told him that he could return to work full time, call the union, or file for short-term disability.

¶11.    Tutor testified that he then called Rhonda Rutherford at the union hall in Jackson, Mississippi, and informed Rutherford about his injury. According to Tutor, Rutherford opined that he should be entitled to workers' compensation benefits, but she told Tutor that she would instead try to get him short-term disability. Rutherford then filled out a form on Tutor's behalf and applied for short-term disability. The form bears a signature purporting to be Tutor's signature, but the evidence reflects that Rutherford signed the form on Tutor's behalf.

---

[5] Dr. Crosswhite also testified that he saw Tutor multiple times between September 2, 2011, and August 6, 2012, regarding Tutor's back injury. Dr. Crosswhite stated that during that time, Tutor "consistently gave the story that he was injured when he heard a dog bark that startled him and he twisted." Dr. Crosswhite testified that he reviewed Tutor's Employer's Medical Examination (EME) report by Dr. Davis and found that "it is consistent with my opinion that [Tutor] sustained injury that was caused from twisting of his back that occurred when a dog barked and he injured his back."

¶12.    The short-term-disability application form also contains Dr. Crosswhite's signature. The record reflects that Rutherford completed, signed, and dated the "Member's Statement" section of the short-term-disability application form for Tutor prior to sending the application to Dr. Crosswhite.  Dr. Crosswhite indicated on the form that Tutor's disability was not work related.[6]  Tutor's short-term disability application was approved, and for the next six months, from September 22, 2011, until March 21, 2012, he received short-term disability benefits.

¶13.    On September 15, 2011, Tutor saw Aaron Ford, a physical therapist.  Ford recommended physical therapy for Tutor one-to-two times a week for four weeks in order to treat Tutor's back pain.  Tutor's physical therapy records reflect that Tutor experienced decreased pain in his back in response to his therapy sessions.  The records from Tutor's September 29, 2011 appointment state that "physical therapy services are discontinued at this time secondary to: goals have been met."  Ford discharged Tutor from physical therapy on September 29, 2011.  Ford's discharge summary for Tutor reflects that Tutor "has met all goals for therapy.  [Tutor] states that he has no pain and if he does, he knows what to do to relieve this pain."

¶14.    Tutor returned to see Dr. Crosswhite on October 13, 2011, complaining of back pain.

---

[6] Dr. Crosswhite testified at trial that he signed the form on behalf of Tutor's "best interest to be able to obtain short-term disability in the most expedient manner possible." Dr. Crosswhite testified that if he had known that the signature on the short-term disability application was not actually Tutor's signature, he would not have signed the form.  Dr. Crosswhite observed that on the form and above Tutor's signature, a box had been marked indicating that Tutor's injury was not work related.  Dr. Crosswhite explained that he therefore also checked "no" on the part of the form that asked whether Tutor's injury was work related, and that he did so in an effort to expedite Tutor's receipt of short-term disability benefits.

Dr. Crosswhite's records from this appointment reflect that Tutor had returned to work and that his back pain "started up again." Dr. Crosswhite referred Tutor for more physical therapy.

¶15.   In October 2011, Tutor again received physical therapy, this time from Mark Bresee. Bresee's notes reflect that during his treatment of Tutor, Tutor responded well to physical therapy, though Tutor "consistently" reported pain associated with driving.

¶16.   On November 2, 2011, Tutor returned to see Dr. Crosswhite. At this appointment, Tutor complained that although he had been going to physical therapy for three weeks, he had not experienced any relief from his back pain. According to his notes, Dr. Crosswhite informed Tutor that he now has limited treatment options. Dr. Crosswhite stated that he had "a very long discussion" with Tutor about his options. Dr. Crosswhite also spoke "at length with a radiologist who has reviewed his films and has reassured that there is no evidence of soft tissue mass or abnormal vertebrae or discs." The radiologist also confirmed to Dr. Crosswhite that Tutor's MRI was normal. Dr. Crosswhite offered to refer Tutor to a pain clinic.

¶17.   On November 10, 2011, Tutor received treatment from nurse practitioner Dawn Frans at North Mississippi Neurosurgical Services. According to Frans's records, Tutor complained of "mid-back pain" that he had suffered from "in a nagging form for over [ten] years." Frans's records further reflect that Tutor twisted his back while delivering a package, and a knot appeared in his back. Frans's record contains a section asking "Is this [workers'] comp?" and Frans typed "No" in response. Frans recommended that Tutor receive a steroid

7

injection. Despite the injection, Tutor did not experience any relief from his back pain. Frans then referred Tutor to Dr. Laura Gray.

¶18.    In the interim, Tutor returned to Dr. Crosswhite on January 16, 2012, complaining of back pain that was too severe for Tutor to report to work.

¶19.    Tutor first saw Dr. Laura Gray, a physiatrist specializing in physical medicine and rehabilitation, on February 1, 2012. According to Dr. Gray's notes, Tutor complained of back pain "to the right of the thoracic spine centered in the muscles." At that appointment, Dr. Gray noticed "a raised area to the right of the thoracic T-4 through T-7 area which appear[ed] to involve muscle." Dr. Gray referred Tutor to a pain-management physician for steroid injections and to set up a follow-up visit.

¶20.    At Tutor's follow-up visit with Dr. Gray on February 21, 2012, Dr. Gray noted that Tutor stated that he received no benefit from the injection, and he claimed that the injections made his back pain worse. Dr. Gray discontinued Tutor's follow up with the pain-management physician, and she referred Tutor to a physical therapist. Dr. Gray then referred Tutor to a physical therapist.

¶21.    Tutor returned for another visit with Dr. Gray on March 6, 2012. Dr. Gray's records from that visit reflect that Tutor's physical therapist determined that Tutor's strain on his thoracic spine "had almost completely resolved." Dr. Gray noted that Tutor "became very upset when he was informed that we felt he needed to be released to work." Dr. Gray's records from Tutor's March 6, 2012 visit also reflect that she released Tutor for work and recommended that Tutor return to work on limited duty for two weeks and then resume full

duty. According to Dr. Gray's records, Tutor then stormed out of her office saying "he had wanted to be off of work." Dr. Gray advised Tutor that since he had a strain, she could not keep him out of work.

¶22. Tutor's medical records from his appointment with Dr. Laura Gray on March 22, 2012, reflect that Tutor "became very upset" and "angry" when Dr. Gray informed him that based on his progress and her findings, she would not be able to keep him off of work. Dr. Gray advised that "working through this type of injury is certainly appropriate." She further opined that Tutor "appears focused on long[-]term disability and retirement. He appears to have a lack of desire to return to work." At trial, Tutor denied telling Dr. Gray that he wanted to be retired. Tutor also testified that Dr. Gray's opinion that Tutor was focused on being long-term disabled was not correct.

¶23. Tutor testified that his short-term disability benefits would end on March 23, 2012, so that led him to contact an attorney to help him obtain workers' compensation benefits. On March 15, 2012, Tutor retained an attorney to represent him in connection with his September 1, 2011 injury. On May 9, 2012, Tutor's attorney filed a petition to controvert with the Mississippi Workers' Compensation Commission (Commission).[7]

¶24. On May 14, 2012, Liberty received notice that Tutor had filed a petition to controvert.

---

[7] After filing his petition to controvert, Tutor continued receiving medical treatment in response to his back pain, including receiving steroid injections and physical therapy. Tutor eventually received another MRI of his thoracic spine on May 31, 2012. The MRI results were then compared with his prior MRI from September 2, 2011. Like the prior MRI, the findings show no objective injury. On August 30, 2012, Tutor had a bone scan performed in response to his thoracic pain. The bone scan impression states that the examination was "unremarkable."

9

The parties do not dispute that prior to receiving notice of Tutor's petition to controvert, Liberty had no knowledge of Tutor's injury and that the petition to controvert was Liberty's first notice of Tutor's claim. Our review of the record also confirms this evidence. Liberty assigned Tutor's case to case-manager Bonnie King.

¶25. Liberty received the petition to controvert on May 15, 2012. That same day, King retained counsel to represent Liberty in its defense of Tutor's claim. The petition to controvert set forth that Tutor "received a compensable injury while in the employ of [UPS]" and claimed that Tutor was chased by a dog. The petition to controvert listed the following information as "to be determined": Tutor's average weekly wage; the period of his alleged temporary disability; the nature, degree and extent of any alleged permanent disability; the date of his maximum medical improvement; the date he will be able to resume employment; and his alleged loss of wage earning capacity, if any. The petition did not contain any of Tutor's medical records; however, the petition did list the names and addresses of the physicians and hospitals where Tutor received medical treatment relating to his injury. The petition also did not identify any witnesses to Tutor's injury.[8]

¶26. On May 16, 2012, defense counsel for Liberty filed an answer denying the material allegations of Tutor's petition to controvert. Liberty's counsel also served Tutor with a first

---

[8] At trial, counsel for Liberty stated that at the time Liberty received the petition to controvert, Liberty was aware that Tutor was receiving short-term disability benefits through the union plan. Our review of the record shows this notice was provided by Dallas in her phone call with King. King's journal entry reflects that Dallas told her that Tutor "filed a personal disability claim and has been off work since September of last year." As we will explain shortly, Tutor's short-term disability form was not attached to his petition to controvert. Liberty did not receive this form until October 16, 2012.

10

set of interrogatories and request for production of documents.

¶27.    In a letter dated May 31, 2012, Tutor's counsel provided Liberty with a document authorizing the release of Tutor's protected health information.[9]  On June 21, 2012, Tutor mailed his discovery responses to Liberty's attorney.  On June 25, 2012, and July 3, 2012, Liberty served subpoenas on the medical providers identified by Tutor in his discovery responses.  Liberty included an explanatory letter and "Medical Records Affidavit" form to be completed and returned with any medical records regarding Tutor's treatment.

¶28.    Liberty then received the medical records from Tutor's medical providers, including Dr. Crosswhite, Dr. Gray, Tutor's physical therapists, and Tutor's chiropractor, Dr. Darrell Blain.  Liberty also received Tutor's MRI results.  The record reflects that Liberty first began receiving Tutor's medical records through discovery at the end of June 2012.  Liberty continued to receive these records through August 2012.[10]

¶29.    Tutor's medical records from his chiropractor, Dr. Blain, reflect that Tutor had been

---

[9] On the form authorizing the release of his medical records, Tutor listed "May 23, 2012," as the effective date for the release.

[10] The record does not support the dissent's assertion that "King instead chose to deny the entire claim and have the lawyers slowly subpoena information readily available to her." Diss. Op. at (¶101).  As set forth above, Tutor's petition to controvert was incomplete.  The petition to controvert listed numerous items as "to be determined," including the period of Tutor's alleged temporary disability; the nature, degree and extent of any alleged permanent disability; the date of his maximum medical improvement; the date he will be able to resume employment; and his alleged loss of wage earning capacity, if any.  The petition also did not contain any of Tutor's medical records or identify any witnesses to Tutor's injury.  Furthermore, the record shows that the day after receiving the petition to controvert, counsel for Liberty sent interrogatories and a request for production of documents to Tutor.  Two weeks later, Tutor's counsel provided a medical records release authorization to Liberty in a letter dated May 31, 2012.

11

receiving treatment from him due to a "frequent moderate grade of burning pain in [Tutor's] right middle back" since November 2010.[11] Dr. Blain's records from Tutor's November 29, 2010 visit reflect that Tutor stated, "[T]here is no change in the pain in his right middle back. On a visual analog scale of 0 to 10 with 0 being no pain and 10 being the worst pain possible, he reports his overall pain is a 7." Tutor continued to see Dr. Blaine periodically.

¶30. On July 13, 2011, less than two months before Tutor's injury, Dr. Blain's records show that Tutor's "chief complaint is an intermittent moderate degree of dull pain in his right middle back. The patient indicates that the pain in his right middle back seems to be worsening." At that time, Tutor described his overall pain as a "five," on a scale of one to ten.

¶31. On August 2, 2012, defense counsel for Liberty first noticed Tutor's deposition. Liberty deposed Tutor on September 12, 2012. After receiving the above-referenced medical records from Tutor's physicians, and after deposing Tutor, Liberty filed an amended answer to the petition to controvert on September 19, 2012. (In this amended answer, Liberty admitted that the relationship of employer and employee existed at the time of the injury, that the parties were subject to the Mississippi workers' compensation laws at the time of Tutor's alleged injury, and that notice of injury complained of in the petition was received.) That same day, Liberty advised Tutor's attorney that it was requesting an "Employer's Medical Examination" (EME) of Tutor to be performed by Dr. John Davis in Jackson. Liberty

---

[11] Tutor testified at the trial that prior to the injury at issue, he had not suffered from back problems. He nonetheless admitted that he had received treatment from a chiropractor every once in a while. As stated, Tutor's medical records show that he had received chiropractic treatment from Dr. Blain since November 2010.

maintained that pursuant to Mississippi Code Annotated section 71-3-15(1) (Rev. 2011)[12] and Mississippi Workers' Compensation Commission General Rule 1.9,[13] Liberty possessed a right to seek an EME of Tutor.

¶32. Tutor's attorney objected to the EME, so Liberty filed a motion to compel the EME with the Commission. In a telephonic hearing held on October 22, 2012, the administrative judge at the Commission granted Liberty's motion to compel the EME.

¶33. On October 16, 2012, Liberty received a copy of Tutor's prior application for short-term disability benefits.

¶34. On October 31, 2012, Dr. John Davis conducted Tutor's EME at NewSouth NeuroSpine in Flowood, Mississippi. Dr. Davis issued a report stating that his examination of Tutor and Tutor's medical records supported the compensability of the claim. Dr. Davis found as follows:

> ASSESSMENT AND PLAN: This is 48-year old gentleman who suffered a well-documented work injury on 09/01/2011 that was reported immediately and led to a supervisor coming and working with him for the remainder of the day. The patient has consistently given exactly the same description of his injury of twisting while he was carrying a box weighing about 60 pounds due to a dog barking at him and perhaps lunging at him. While it is clear that Tutor did seek and receive chiropractic care for what was sometimes described as low back discomfort and sometimes described as mid[-]back discomfort

[12] Section 71-3-15(1) ("Medical Services for Injured Employee") provides, in pertinent part, that "[s]hould the employer desire, he may have the employee examined by a physician other than of the employee's choosing for the purpose of evaluating temporary or permanent disability or medical treatment being rendered under such reasonable terms and conditions as may be prescribed by the commission."

[13] Rule 1.9 ("Selection of Medical") provides, in pertinent part, that "[t]he employer may have the injured employee examined by a physician of its choice for the purpose of evaluating temporary or permanent disability or medical treatment being rendered."

either on the left or the right hand side, he is clear in stating today that that was treatment he sought just because it helped with stress. Furthermore, the testimony of both of his supervisors was that he never complained of back or spine problems while working at UPS nor did he ever miss any work while at UPS due to a back or spine problem. Furthermore, his treating chiropractor in reevaluating him noted and wrote in a letter that his problems since 09/01/2011 are completely different from what he was treating the patient for prior to that date. Additionally according to the records that l have, Tutor's last visit with the chiropractor was on 07/13/2011 or greater than six weeks prior to his reported work injury of 09/01/2011. For all of the reasons noted above, it is my opinion with a reasonable degree of medical probability that Tutor did indeed suffer an injury on the job associated with a twisting injury on 09/01/2011 and that the care that he has obtained since that point is indeed directly causally related to that injury. My opinion is based on the history from the medical record as I have summarized above as well as the history provided by the patient himself.

. . . .

ln my opinion, the next step in this case should be a determination by either Dr. Gray or Dr. Martinez of when the patient has reached MMI. Typically this wou1d entail a functional capacity evaluation followed by a declaration of MMI and an impairment rating as well as a declaration of permanent work restrictions.

¶35. After receiving Dr. Davis's report, Liberty filed an amended answer on November 6, 2012, and accepted compensability of Tutor's claim. The record shows that Liberty accepted compensability of Tutor's claim without conducting a functional-capacity evaluation as suggested by Dr. Davis. Liberty subsequently paid all indemnity benefits and medical expenses owed to Tutor or his medical providers. Liberty ultimately paid Tutor for his total loss of wage-earning capacity in the amount of $160,000.

¶36. On October 22, 2013, Tutor filed a complaint in the Clay County Circuit Court against Liberty, UPS, Dallas, and King in this instant action. In the complaint, Tutor asserted that he was entitled to extra-contractual compensatory damages and punitive damages from the

defendants for the alleged bad-faith handling of his prior workers' compensation claim. Just prior to the trial, Tutor voluntarily dismissed the individual defendants King and Dallas. The trial was then limited to Tutor's claims against UPS and Liberty.

¶37. A jury trial was held on July 17–22, 2017. At trial, the jury heard testimony from Tutor and his wife, Kim, as well as Dallas; King; Gary Bishop, a supervisor at UPS; Rupert Cornwall, a supervisor at UPS; Quarles, an expert in the field of workers' compensation procedure and claims handling adjusting;[14] Dr. Crosswhite, Tutor's general practitioner; and Jim Higginbotham, Liberty's expert witness in the field of Mississippi workers' compensation law, practice, and standards, as well as the standards applicable to insurance companies and adjustors.

¶38. At the close of Tutor's case-in-chief, Liberty moved for a directed verdict on the ground that Liberty possessed an arguable basis to initially deny Tutor's claim and then investigate the claim. The trial court denied the motion. The trial court again denied the motion after all parties rested.

¶39. The jury returned a verdict awarding Tutor $500,000 in extra-contractual damages against UPS and $100,000 against Liberty. On Tutor's claim for punitive damages, the jury returned a verdict ruling in favor of Tutor but awarding no damages against UPS or Liberty.

¶40. After the trial but before a judgment was entered, UPS and Tutor reached a

---

[14] Relevant to the present case, prior to trial, Liberty filed a motion to exclude the testimony of Tutor's expert witness, Lydia Quarles, as inadmissible under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 589 (1993). The trial court denied this motion.

confidential settlement of Tutor's claim against UPS.[15] On August 21, 2017, the trial court entered its final judgment against Liberty for $100,000 and awarded no punitive damages against Liberty.

¶41.    On August 31, 2017, Liberty filed a motion for judgment notwithstanding the verdict (JNOV) asserting, among other things, that Liberty possessed an arguable, good-faith basis for its initial denial of Tutor's claim and that Liberty possessed the right to fully investigate Tutor's claim. The trial court heard arguments on the motion, and on December 14, 2017, the trial court entered an order denying Liberty's motion. On January 11, 2018, Liberty filed its notice of appeal.

¶42.    In its appellate brief, Liberty sets twelve assignments of error, which we quote in full:

1.    Liberty was the worker's compensation carrier for Tutor's employer, [UPS]. Liberty received its first notice of Tutor's injury when it received the [p]etition to [c]ontrovert he filed in the [Commission] approximately eight and a half . . . months after his alleged injury and approximately two months after he retained counsel. Can Liberty be subjected to extra-contractual damages for exercising its rights under the Mississippi Workers' Compensation Law. . . and the Rules of the [Commission] in its investigation and handling of Tutor's claim?

2.    Is the evidence sufficient to support the elements necessary to establish a claim for extra-contractual damages against Liberty, including the evidence necessary to establish liability and the evidence necessary to support the specific damages allegedly caused by Liberty?

3.    Is the evidence sufficient to prove the absence of a legitimate or arguable reason for Liberty's handling of Tutor's claim for worker's compensation benefits?

---

[15] The trial court's judgment reflects that "[f]ollowing the verdict, UPS agreed to a full and final settlement of all claims with [Tutor]. Therefore, there remain no issues to be litigated by or between [Tutor] and UPS nor adjudicated or determined by this [c]ourt or on appeal."

4.	Is the evidence sufficient to support the damage award against Liberty, including the award of damages for mental or emotional distress and the penalty Tutor allegedly incurred from withdrawing funds from his retirement account?

5.	Did the trial court erred in denying Liberty's *Daubert* [m]otion and allowing [Tutor] to offer the opinions of his expert, Lydia Quarles?

6.	May the opinions of [Tutor's] expert, Lydia Quarles, be considered, in whole or in part, in determining the sufficiency of the evidence to support Tutor's claims for extra[-]contractual and punitive damages?

7.	Is the evidence sufficient to create a jury issue on the elements necessary to establish a claim for punitive damages against Liberty?

8.	Is the evidence sufficient to prove that Liberty committed an intentional, willful or malicious wrong or acted with gross negligence or a reckless disregard for Tutor in its handling of his claim for worker[s'] compensation benefits?

9.	Is the evidence sufficient to prove by clear and convincing evidence that Liberty acted with actual malice, gross negligence which evidenced a willful, wanton or reckless disregard for the safety of others, or that it committed actual fraud, as required by Miss[issippi] Code Ann[otated] [section] 11-1-65 [(Supp. 2004)]?

10.	Is the evidence sufficient to prove that Liberty's handling of Tutor's claim rose to the level of an independent tort or constitutes "bad faith" under Mississippi law?

11.	Under Mississippi law, the duty of good faith and fair dealing applies to both parties. Did Tutor breach his duty of good faith and fair dealing by failing to give Liberty an opportunity to consider his claim before commencing litigation in the [Commission]? If so, what effect does his breach have on his right to recover extra-contractual damages from Liberty?

12.	Is the evidence sufficient to support the jury's answer to question no. 1 of its response to the [s]econd [s]et of [i]nterrogatories as to Liberty regarding the punitive damages issue?

17

We find the issue of whether the evidence presented at trial was insufficient to support the jury's verdict dispositive, and we therefore decline to address the remaining issues.

## DISCUSSION

¶43.    Liberty argues that the evidence presented at trial was insufficient to support the jury's verdict that Liberty was liable to Tutor for extra-contractual damages.  Accordingly, Liberty maintains that the trial court erred by failing to grant its motion for a directed verdict at the close of Tutor's case-in-chief and in failing to grant Liberty's posttrial motion for a JNOV. As we will discuss, Tutor bore the burden of proving that Liberty either lacked a legitimate or arguable basis for denying his workers' compensation claim or that Liberty committed a willful or malicious wrong or acted with gross and reckless disregard for his rights.  After reviewing the evidence in the light most favorable to Tutor, the nonmoving party, we find that Tutor failed to meet his burden of proving bad-faith handling of his workers' compensation claim by Liberty.

¶44.    "A motion for a directed verdict made at the end of the plaintiff's case-in-chief, a renewed motion for a directed verdict at the end of all evidence, a request for a peremptory instruction, and a motion for a JNOV are all procedural vehicles for challenging the sufficiency of the evidence." *Latham v. Johnson*, 262 So. 3d 569, 581 (¶69) (Miss. Ct. App. 2018).  We review a trial court's denial of a motion for a directed verdict and a motion for a JNOV de novo.  *McGee v. River Region Med. Ctr.*, 59 So. 3d 575, 578 (¶8) (Miss. 2011); *see also Latham,* 262 So. 3d at 581 (¶68) (We apply the same standard when reviewing a trial court's denial of a directed verdict and a JNOV.).

18

¶45. When reviewing a trial court's ruling on a motion for a directed verdict, we "must look solely to the testimony provided by the nonmoving party, reviewing the evidence in the light most favorable to the nonmoving party and giving that party the benefit of all favorable inferences that reasonably may be drawn from the evidence." *Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1200 (¶12) (Miss. 2012). "If the evidence presented creates a question of fact upon which reasonable minds could differ, then the motion for [a] directed verdict should be denied." *Id.* This Court will reverse a trial court's denial of a motion for a directed verdict "if the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *Am. Optical Corp. v. Estate of Rankin*, 227 So. 3d 1062, 1068 (¶20) (Miss. 2017).

¶46. It is important to clarify that "[o]n appeal, when the sufficiency of the evidence is challenged, 'this Court properly should review the [trial court's] ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court.'" *Jernigan v. Humphrey*, 815 So. 2d 1149, 1152 (¶12) (Miss. 2002). In the present case, the last occasion on which the trial court made a ruling on the sufficiency of the evidence was the denial of Liberty's JNOV motion. The supreme court explained that

> [a] motion for JNOV tests the legal sufficiency of the evidence supporting the verdict, not the weight of the evidence. *Where a motion for JNOV has been made, the trial court must consider all of the evidence—not just evidence which supports the non-movant's case—in the light most favorable to the party opposed to the motion.* The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable jurors could not have arrived at a contrary verdict, granting the motion is required.

19

*Smith v. Union Carbide Corp.*, 200 So. 3d 1035, 1041 (¶12) (Miss. 2016) (emphasis added) (citations and internal quotation marks omitted); *see also Solanki v. Ervin*, 21 So. 3d at 552, 556 (¶8) (Miss. 2009) ("This Court has also held that 'in considering the evidence and all reasonable inferences, the court must determine whether the evidence is so overwhelmingly against the nonmovant that no reasonable juror could have found in [the nonmovant's] favor.'") (quoting *Fox v. Smith*, 594 So. 2d 596, 603 (Miss. 1992)). However, "if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand." *Union Carbide*, 200 So. 3d at 1041 (¶12).[16]

¶47.    In Tutor's complaint, he alleged that Liberty delayed the payment of benefits to Tutor in bad faith and without a legitimate or arguable reason. Tutor asserted he was entitled to extra-contractual damages as well as punitive damages, and he alleged that Liberty's bad faith and breach of fiduciary duty "was attended by a willful and intentional or malicious wrong, insult, abuse[,] or gross negligence, all with total callous disregard for [Tutor's] rights and with a conscious indifference to the consequences to [Tutor]." In support of his assertion, Tutor argued that Liberty denied his claim for a period of six months without procuring a medical expert's opinion and despite Liberty having access to Tutor's medical records. Tutor also contended that Liberty failed to adequately and timely investigate Tutor's

---

[16] The dissent cites to evidence regarding UPS's actions. Diss. Op. at (¶99). As stated, before a final judgment was entered, UPS and Tutor reached a confidential settlement of Tutor's claims against UPS, and UPS is not a party to this appeal. Therefore, it is not proper to impute UPS's actions to Liberty.

20

claim.

¶48. We recognize that to prove a bad-faith claim, the plaintiff/claimant bears the burden of proving "that the insurer either lacked a legitimate or arguable basis for denying his claim or that it committed a willful or malicious wrong or acted with gross and reckless disregard for his rights." *Chapman v. Coca-Cola Bottling Co.*, 180 So. 3d 676, 681 (¶22) (Miss. Ct. App. 2015).[17] The supreme court has clarified that "[t]he plaintiff's burden in proving a claim for bad faith refusal goes beyond proving mere negligence in performing the investigation. The level of negligence in conducting the investigation must be such that a proper investigation by the insurer would easily adduce evidence showing its defenses to be without merit." *United Servs. Auto. Ass'n (USSA) v. Lisanby*, 47 So. 3d 1172, 1178 (¶18) (Miss. 2010) (quoting *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 534 (¶12) (Miss. 2003)).

¶49. The supreme court has explained that "[w]hen an insurer denies a claim without an arguable basis, but the jury does not award punitive damages, extra[-]contractual damages may provide an intermediate form of relief." *Fulton v. Miss. Farm Bureau Cas. Ins. Co.*, 105 So. 3d 284, 288 (¶20) (Miss. 2012). The *Fulton* court clarified that "extra[-]contractual damages serve a different role than punitive damages in insurance actions," explaining that

---

[17] *See Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 479 (¶9) (Miss. 2002); *Aetna Cas. & Sur. Co. v. Steele*, 373 So. 2d 797, 801 (Miss. 1979); *Hardaway v. Howard Indus. Inc.*, 211 So. 3d 718, 722 (¶16) (Miss. Ct. App. 2016) ("Mississippi law recognizes that a claimant may have an independent cause of action in tort for bad faith refusal to pay workers' compensation benefits when an insurance carrier or self-insured employer denies benefits without a legitimate or arguable basis, commits a willful or malicious wrong, or acts with gross and reckless disregard for the claimant's rights.").

"in the insurance context, 'extra[-]contractual damages' are not punitive damages in the traditional sense. Extra[-]contractual damages are awarded when punitive damages are not, and are intended to cover reasonably foreseeable costs and expenses, such as attorney's fees." *Id*. at 288-99 (¶¶20, 22) (footnote omitted).

¶50. Critical to our inquiry, the supreme court has held that "[e]xtra[-]contractual damages, such as awards for emotional distress and attorneys' fees, are not warranted where the insurer can demonstrate 'an arguable, good-faith basis for denial of a claim.'" *Lisanby*, 47 So. 3d at 1178 (¶18).[18] The supreme court has defined an arguable reason as "nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to the heightened level of an independent tort." *Windmon v. Marshall*, 926 So. 2d 867, 873 (¶24) (Miss. 2006). The claimant bears the burden of demonstrating that the insurer had no arguable reason for denying the claim. *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1097 (Miss. 1996). Precedent reflects that the insurer is "not required to disprove all possible allegations made by a claimant. [It is] simply required to perform a prompt and adequate investigation and make a reasonable, good faith decision based on that investigation." *McKneely*, 862 So. 2d at 535 (¶16).

---

[18] However, in order to recover punitive damages, the insured must show both that the insurer denied the claim "without an arguable or legitimate basis, either in fact or law," and "with malice or gross negligence in disregard of the insured's rights." *Hoover v. United Servs. Auto. Ass'n*, 125 So. 3d 636, 643 (¶22) (Miss. 2013); *see also* Jeffrey Jackson and D. Jason Childress, *Miss. Ins. Law and Prac*. § 13:4, 321-22 (2019 ed.) ("[I]n order to recover punitive damages for the tort of bad faith, the insured must prove" both that "the insurer lacked an arguable or legitimate basis for denying the claim; and . . . the insurer committed a willful or malicious wrong, or acted with gross and reckless disregard for the insured's rights.").

¶51. In response to Tutor's argument, Liberty states that Tutor was not entitled to extra-contractual damages because Liberty possessed an arguable basis for delaying Tutor's workers' compensation claim. Liberty argues that pursuant to *Short v. Wilson Meat House LLC*, 36 So. 3d 1247, 1253-54 (¶30) (Miss. 2010), Liberty possessed the right to question and investigate Tutor's claim once it received Tutor's petition to controvert. *See also McKneely*, 862 So. 2d at 534 (¶12) ("When faced with a claim, an insurer is required to perform a prompt and adequate investigation of the circumstances surrounding the claim."); *Caldwell*, 686 So. 2d at 1097 ("Mississippi law imposes a duty upon insurers to conduct a reasonably prompt investigation of all relevant facts.") (internal quotation mark omitted). Liberty argues that it was merely exercising its rights as set forth in Mississippi workers' compensation law to conduct discovery of the claim set forth in the petition to controvert and that in so doing, Liberty was not acting in bad faith in investigating Tutor's claims.[19] Liberty submits that the evidence available to Liberty when it filed its initial answer to Tutor's petition to controvert—Tutor's unwitnessed and uncorroborated account that he had hurt his back when a dog startled him; his admission that he had a prior history of back problems; and evidence that following his injury, Tutor received short-term disability benefits that would not have been payable for a work-related injury—was insufficient to entitle Tutor to benefits. Liberty also asserts that the medical records it received in discovery prior to the EME performed by Dr. Davis provided a legitimate reason to question Tutor's entitlement to benefits and

---

[19] *See, e.g.*, *Life & Cas. Ins. Co. of Tenn. v. Bristow*, 529 So. 2d 620, 623 (Miss. 1988); *Hurdle & Son v. Holloway*, 976 So. 2d 386, 389-90 (¶13) (Miss. Ct. App. 2008); Miss. Workers' Comp. Comm'n Proc. R. 2.4, 2.7.

investigate the allegations set forth in Tutor's petition to controvert.

¶52. We recognize that "Mississippi law does indeed impose a duty upon the insurance company to promptly and fully investigate any claim." *Bristow*, 529 So. 2d at 623.[20] The supreme court has established that "this involves 'the obtaining of all available medical information relevant to the claim.'" *Id*. The Mississippi Workers' Compensation Commission's Procedural Rules also provide an insurance carrier with the right to conduct discovery upon receipt of a petition to controvert. *See* Miss. Workers' Comp. Comm'n Proc. R. 2.4, 2.7. Mississippi Workers' Compensation Commission Procedural Rule 2.4 cautions that "[a]verments contained in claimant's [p]etition to [c]ontrovert to which a responsive answer is required are admitted unless denied in the [a]nswer."[21]

¶53. In *Holloway*, 976 So. 2d at 389 (¶13) (citing current Mississippi Workers'

---

[20] *See* Jeffrey Jackson and D. Jason Childress, *Miss. Ins. Law and Prac*. § 13:5, 325 (2019 ed.) ("Obviously, some delay in evaluating claims is inevitable, legitimate, and socially useful. Insurers are entitled, and in fact legally obligated, to investigate fully the legitimacy of claims, and some skepticism in evaluating claims is appropriate."). This treatise cites to the following cases in support of its assertion: *Barnes v. Stonebridge Life Ins. Co.*, 624 F. Supp. 2d 574, 581-52 (S.D. Miss. 2009) (citing treatise) (not bad faith to delay investigation of disability claim (which was later fully paid) until after 180-day survival period under policy); *Bryant v. Prime Ins. Syndicate Inc.*, No. 1:07CV1126–LG–RHW, 2009 WL 1850941, *4 (S.D. Miss. June 25, 2009) (delay in paying claim while investigating the same is not of bad faith); *Lee v. State Farm Mut. Auto. Ins. Co.*, No. 2:08cv203KS–MTP, 2009 WL 2900014, *4-6 (S.D. Miss. September 2, 2009) (criticizing insurer's slow investigation of uninsured motorist claim but finding no bad faith, where insurer delayed claim payment due to its need to investigate plaintiff's prior accident, which accident, as it turned out, insurer had adjusted and, therefore, had a claim file on); *Caldwell*, 686 So. 2d at 1098-99 (no bad faith due to six-week delay in making uninsured motorist payments where the insurer was conducting a thorough investigation into existence of other insurance and never denied the claim).

[21] At the time Tutor filed his petition to controvert, this rule was memorialized in Mississippi Workers' Compensation Commission Procedural Rule 4.

Compensation Commission Procedural Rules 2.4 and 2.7), this Court recognized the insurer's due process rights: "Among other things, the Procedural Rules of the Mississippi Worker Compensation Commission require that, in order to controvert an issue, a claimant must file a petition to controvert, giving the employer and carrier an opportunity to answer and conduct discovery." In that case, this Court determined that the due process rights of the employer and workers' compensation insurer were violated when the administrative judge allowed an evidentiary hearing on the claimant's claim without giving notice to the employer and insurer, requiring the claimant to file a petition to controvert, giving the employer and insurer an opportunity to answer and conduct discovery, or requiring pre-hearing statements to be filed. *Id*. at 389-90 (¶¶13-15). The *Holloway* Court explained that "the failure to abide by recognized discovery rules impacts whether a decision is seen as arbitrary and capricious, and [a] violation of due process." *Id*. at 389 (¶12).

¶54. With respect to investigating Tutor's claim in his petition to controvert, in *Walker v. Kinder Morgan Inc*., 242 So. 3d 893, 898 (¶26) (Miss. Ct. App. 2017), this Court stated that in order to make a prima facie case of disability, "a claimant must show by a fair preponderance of the evidence that (1) an accidental injury occurred (2) which arose out of and in the course of employment and (3) that the injury and claimed disability are causally connected." The claimant bears the burden of establishing "every essential element of the claim, and it is not sufficient to leave the matter to surmise, conjecture, or speculation." *Johnson v. Sysco Food Servs*., 122 So. 3d 159, 162 (¶9) (Miss. Ct. App. 2013). "[T]he burden of proof [then] shifts to the employer to rebut or refute the claimant's evidence."

25

*Walker*, 242 So. 3d at 898 (¶26). Relevant to the determination of whether a claimant suffered a compensable work-related injury, this Court clarified that "[t]he evidence used to prove the causation must be credible medical evidence and not mere speculation." *Id*. at 900 (¶32).

¶55. With the claimant's burden of proof in mind, we acknowledge that in the instant case, the face of the petition to controvert contained incomplete information and an ambiguous and uncorroborated scenario as to the occurrence of Tutor's injury. Stated otherwise, the face of Tutor's petition to controvert failed to establish a prima facie case. As stated, the record contains extensive medical evidence from various physicians regarding Tutor's injury as well as evidence of the medical treatments Tutor received for back pain he suffered prior to this injury. Counsel for Liberty subpoenaed Tutor's medical records on June 25, 2012, and July 3, 2012. The record reflects that Liberty first began receiving Tutor's medical records through discovery at the end of June 2012. Liberty continued to receive these records through August 2012. After our review of the record, we find that Tutor's medical records, which we discussed in detail above, contained conflicting evidence indicating that Tutor's injury was not work related. Due to these conflicting medical records, we find that Liberty established a good-faith, arguable basis to investigate Tutor's petition to controvert, to file an answer denying the petition to controvert established a prima facie claim, and to exercise its rights under workers' compensation laws to conduct discovery. *See Lisanby*, 47 So. 3d at 1178 (¶18) ("Extracontractual damages, such as awards for emotional distress and attorneys' fees, are not warranted where the insurer can demonstrate 'an arguable, good-faith

26

basis for denial of a claim.'").

¶56.  Bonnie King, a case manager for Liberty, testified via her video deposition. King testified that at the time of Tutor's injury, she was a senior claims consultant for Liberty Mutual, and she was responsible for all of the workers' compensation claims with UPS in a five-state area.

¶57.  King stated that she first became aware of Tutor's workers' compensation injury on May 14, 2012, after Tutor filed his petition to controvert. King testified that prior to receiving this notice, Liberty had no file on Tutor's current injury or claim. King stated that John Felix, the district claims manager at UPS, emailed King and asked her to assign Tutor's case to Liberty's defense counsel. King testified that she sent Tutor's petition to controvert (filed by Tutor's counsel) to Liberty's legal counsel and that Liberty then "immediately" proceeded with discovery of the averments in the petition to controvert. As acknowledged, Tutor's petition to controvert was incomplete and set forth an uncorroborated claim. King explained that when she receives a blind lawsuit, meaning that she had had no notice of the claim prior to the suit being filed, she automatically sends the complaint to Liberty's legal counsel and tells counsel to file an answer denying everything pending Liberty's full investigation of the matter. King testified that a lawyer licensed in Mississippi has to answer the petition to controvert; she could not file the answer to the petition herself since she was not a lawyer.[22]

¶58.  King testified that she then called Dallas to file a report regarding Tutor's injury. On

_____

[22] *See* Miss. Code Ann. § 73-3-55 (Rev. 2008) (prohibiting the unlicensed practice of law).

May 14, 2012, King received Dallas's first report of injury.

¶59.    King's electronic journal entries, which she maintained during the investigation of Tutor's claim, were admitted into evidence.  In King's electronic journal entry from May 16, 2012, she documented her plan regarding Tutor's claim.  King's entry stated as follows:

> Denial of allegations in the Summons and Complaint filed by [Tutor].  First notice of claim is by Blind Suit.
>
> Defense Will:
> Answer the Petition to Controvert
> File a standard set of interrogatories
> Notice Plaintiff Deposition
> Subpoena records of identified physicians noticed in the complaint
>
> Claims Will:
> Direct Litigation Management
> We will review our discovery as received to determine any necessary further direction to Defense Alms [sic] Referral.

¶60.    During her testimony, King also read from another journal entry stating that she spoke to Dallas on May 16, 2012, after the petition to controvert was filed.  During that conversation, Dallas informed King that Tutor had wanted to take off work, but "he was told that he did not have any [leave time] left."  King's journal entry reflects that during this conversation, Dallas told her that Tutor called in and told UPS that he had a catch in his back, so Dallas sent a supervisor to get him.  Tutor informed Dallas that he was making a delivery and was on the porch when a dog startled him.  As stated, the record reflects that the petition to controvert alleges a slightly different event—that a dog had chased Tutor.  King's entry also reflected that Tutor told Dallas that he had a catch in his back that was aggravated and that Tutor had already been receiving treatment from a chiropractor.  Dallas informed King

28

that Tutor then filed a personal disability claim and had been off work since September 2011. King's entry reflected that a female doctor had called Dallas and indicated that Tutor needed to return to work.

¶61.    Regarding Liberty's decision to deny all of the allegations in Tutor's petition to controvert, King explained that Liberty's answer was filed solely based on information they had at the time of receipt of the petition, which was three incomplete documents: Tutor's first report of injury, prepared by Dallas; King's May 16, 2012 journal entry reflecting her conversation with Dallas regarding Tutor's injury; and Tutor's injury-prevention report. King testified that at that time, she did not have any of Tutor's medical records or disability records. The petition to controvert set forth that no witnesses were "known at this time," and that "other witnesses [were] to be determined."[23]

¶62.    King testified, and the record reflects, that she updated her electronic journal entries as she received discovery from Tutor and to reflect communication between Liberty's counsel and Tutor's counsel. Regarding Liberty's discovery on the petition to controvert, the record reflects that Liberty received Tutor's interrogatory response and requests for production in June 2012. In June and July of 2012, Liberty then served subpoenas on the

---

[23] The dissent states that "There was no conflicting testimony concerning [Tutor's] injury presented to the jury." Diss. Op. at (¶104). This is inaccurate, and it ignores the evidence that Liberty actually had at the time it preliminarily denied Tutor's claim. The dissent's analysis depicts the proof as though Liberty had access to the full record that was presented at trial, but the record reflects that this is not the case. The dissent also glosses over the fact that prior to receiving notice of Tutor's petition to controvert, Liberty had no knowledge of Tutor's injury. Furthermore, the dissent ignores the fact that Tutor's petition to controvert was incomplete. The record confirms that the petition to controvert was Liberty's first notice of Tutor's claim.

medical providers identified in Tutor's discovery responses. Although King had previously been informed by Dallas that Tutor had received short-term disability benefits, Liberty received the records regarding Tutor's short-term disability claim on October 16, 2012, through discovery. Dr. Davis conducted Tutor's EME on October 31, 2012.

¶63. On August 2, 2012, defense counsel for Liberty first noticed Tutor's deposition, and Liberty eventually deposed Tutor on September 12, 2012. Based upon the conflicting information in Tutor's medical records, including no evidence of an objective injury, Liberty also advised Tutor's attorney of its request for an EME of Tutor to be performed by Dr. John Davis. Tutor's attorney objected to the EME. However, over a month later, on October 22, 2012, the administrative judge at the Commission granted Liberty's motion to compel the EME.

¶64. King testified that after Liberty conducted its discovery and reviewed the materials, including Dr. Davis's EME report, Liberty decided to accept Tutor's workers' compensation claim. King's electronic journal entry from November 5, 2012 reflects that Liberty would accept compensability of Tutor's claim based on Dr. Davis's EME report. Liberty accepted compensability without conducting a functional-capacity evaluation.

¶65. During Tutor's case-in-chief, the jury also heard testimony from Quarles, Tutor's expert witness in the field of workers' compensation procedure and claims-handling adjusting. Quarles testified that Dallas, Tutor's supervisor at UPS, should have reported the injury to Liberty and provided Liberty with any information Dallas had gathered regarding Tutor and his injury. As to industry standards for insurance carriers, Quarles testified that

once Liberty received notice of Tutor's claim, they had a duty to investigate the claim. Quarles explained that Liberty actually created a procedure for investigating claims that had since become industry standard. Quarles stated that this procedure requires an adjuster to immediately make three points of contact in order to determine if a claim is valid: the injured employee, the employers and any witnesses, and any person with medical information.

¶66. Quarles explained that Liberty had twenty-three days to respond to Tutor's petition to controvert. Quarles opined that in her view, there was no reason that Liberty needed to file an answer denying Tutor's claim two days after receiving the petition to controvert, as opposed to waiting another twenty-one days to file an answer. As to Liberty's investigation of Tutor's claim, Quarles testified that Liberty's decision to deny Tutor's claim from May until November 2012 without the opinion of a physician to support their decision was not consistent with industry standards. Quarles also testified that Liberty, not their attorney, was responsible for investigating Tutor's claim.

¶67. However, the parties agree, and the record reflects, that Liberty possessed no notice of Tutor's claim until Tutor's counsel filed the petition to controvert. Once Tutor filed his petition to controvert containing his uncorroborated claim that failed to establish the requirements of a prima facie claim, Liberty then possessed due process rights under the Mississippi Workers' Compensation Rules and precedent to conduct discovery. As we have set forth above, "Mississippi law does indeed impose a duty upon the insurance company to promptly and fully investigate any claim." *Bristow*, 529 So. 2d at 623. This duty involves "obtaining . . . all available medical information relevant to the claim." *Id*. Upon receipt of

31

a petition to controvert a workers' compensation claim, insurance carriers also have the right to conduct discovery. *See Holloway*, 976 So. 2d at 389 (¶13) ("[I]n order to controvert an issue, a claimant must file a petition to controvert, giving the employer and carrier an opportunity to answer and conduct discovery."); Miss. Workers' Comp. Comm'n Proc. R. 2.4, 2.7. Moreover, the record reflects that Tutor filed his petition to controvert without attaching any supporting medical records; therefore, discovery was required to determine if a valid claim existed and to obtain Tutor's relevant medical records. The record reflects that once Liberty received Tutor's petition, Liberty retained counsel who then conducted the necessary discovery. As reflected in the record and set forth herein, the medical records later received during discovery contained contradicting information regarding the nature and onset of Tutor's back injury as asserted in Tutor's petition. These medical records included records of Tutor's chiropractic treatment that he received prior to his injury; Tutor's MRI results showing no objective injury on the day after the accident; Dr. Gray's March 6, 2012 medical determination that Tutor was ready to return to work; and Tutor's short-term disability application reflecting no work-related injury.

¶68.    At the close of Tutor's case-in-chief, Liberty made a motion for a directed verdict on the ground that Liberty possessed an arguable basis to initially deny Tutor's claim and then investigate the claim.[24]  The trial court denied Liberty's motion.

¶69.    The trial continued, and the jury heard testimony from Jim Higginbotham, Liberty's expert witness in the field of Mississippi Workers' Compensation law, practice, and

---

[24] Counsel for UPS also made a motion for a directed verdict, which the trial court denied.

standards, as well as the standards applicable to insurance companies and adjustors. After all of the parties rested, the jury ultimately entered a verdict in favor of Tutor. Liberty filed a motion for a JNOV, which the trial court denied.

¶70. As stated, we review a trial court's denial of motion for a directed verdict and a JNOV de novo. *McGee*, 59 So. 3d at 578 (¶8). Furthermore, "[e]xtracontractual damages . . . are not warranted where the insurer can demonstrate 'an arguable, good-faith basis for denial of a claim.'" *Lisanby*, 47 So. 3d at 1178 (¶18). An arguable reason for denying a claim can consist of "nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to the heightened level of an independent tort." *Windmon*, 926 So. 2d at 873 (¶24). To meet his burden of proving Liberty's bad-faith handling of his workers' compensation claim and to recover extra-contractual damages, Tutor had to prove that Liberty lacked a legitimate or arguable basis for denying his claim. *Lisanby*, 47 So. 3d at 1178 (¶18). Tutor's burden of proof "goes beyond proving mere negligence in [Liberty's] performing the investigation. The level of negligence in conducting the investigation must be such that a proper investigation by [Liberty] would easily adduce evidence showing its defenses to be without merit." *Id.* (quoting *Windmon*, 926 So. 2d at 873 (¶25)).

¶71. As already explained, precedent and the Mississippi Workers' Compensation Rules impose a duty on an insurance carrier to promptly and fully investigate any claim, which includes conducting discovery. *Bristow*, 529 So. 2d at 623; *Holloway*, 976 So. 2d at 389 (¶13); Miss. Workers' Comp. Comm'n Proc. R. 2.4, 2.7. In *Walker*, 242 So. 3d at 898 (¶26), this Court stated that claimant must make a prima facie case of disability by a "fair

33

preponderance of the evidence." In the present case, Tutor, as the claimant, bore the burden of establishing "every essential element of the claim, and it is not sufficient to leave the matter to surmise, conjecture, or speculation." *Johnson*, 122 So. 3d at 162 (¶9). In adjudicating a petition to controvert in a workers' compensation case, "the burden of proof [then] shifts to the employer to rebut or refute the claimant's evidence." *Walker*, 242 So. 3d at 900 (¶32). Relevant to the determination of whether a claimant suffered a compensable work-related injury, this Court clarified that "[t]he evidence used to prove the causation must be credible medical evidence and not mere speculation." *Id*. The record reflects that the face of Tutor's petition to controvert failed to establish a prima facie claim for workers' compensation benefits; as a result, discovery was required to determine the validity of the claim.[25]

¶72.    In *Pilate v. American Federated Insurance Co.*, 865 So. 2d 387, 392 (¶27) (Miss. Ct. App. 2004), this Court addressed whether the insurance carrier or claims adjuster committed bad faith in the delay of payment of benefits to the claimant during the investigation of the claim. The claimant in *Pilate* sought punitive damages and alleged that the carrier and claims adjuster committed bad faith in their failure to timely report, investigate, and timely pay the claimant's claim. *Id*. at 390 (¶19).

¶73.    In its discussion, this Court set forth that "[t]he duty to timely investigate and pay workers' compensation claims is a mutual obligation of both the claimant and the employer

---

[25] With regard to punitive damages, precedent reflects that "[g]enerally, a client's reliance upon advice of his attorney prevents a finding of bad faith and the imposition of punitive damages." *McKneely*, 862 So. 2d at 536 (¶18).

or its carrier. The employer or carrier may not ignore the duty and wait for the claimant to provide the necessary information." *Id.* at 400 (¶67); *see also Bankers Life & Cas. Co. v. Crenshaw*, 483 So. 2d 254, 276 (Miss. 1985). This Court also clarified that "[n]ot all delays in the payment of claims are actionable," explaining as follows:

> Obviously, some delay in evaluating claims is inevitable, legitimate[,] and socially useful. Insurers are entitled, and in fact legally obligated, to investigate fully the legitimacy of claims, and some skepticism in evaluating claims is appropriate. Since an insurer has an obligation under Mississippi law to investigate claims, discharging that duty is not bad faith. However, an inadequate investigation of a claim may create a jury question on the issue of bad faith.

*Pilate*, 865 So. 2d at 394 (¶35) (quoting Jeffrey Jackson, *Mississippi Insurance Law* § 12:5 (2001 ed.)); *see also Lewis v. Equity Nat'l Life Ins. Co.*, 637 So. 2d 183, 187 (Miss. 1994) (explaining that a proper investigation of an insured's claim requires the insurer to obtain "all available medical information relevant to the policyholder's claim" and interview all employees or individuals who have "knowledge relevant to the claim . . . ."). This Court ultimately held that the carrier's "explanation of its investigation was sufficient to determine that neither [the carrier's] nor [the adjuster's] conduct rose to the level of gross negligence or an independent tort." *Pilate*, 865 So. 2d at 400-01 (¶71). This Court then affirmed the trial court's grant of summary judgment in favor of the carrier and the adjuster. *Id*. at 401 (¶72).

¶74. In *Short*, 36 So. 3d at 1253-54 (¶¶30-31), the supreme court affirmed the Mississippi Workers' Compensation Commission's finding that a claimant failed to establish that he was injured on the job. In *Short*, like the instant case, the claimant submitted an uncorroborated

claim listing no witnesses, and the supreme court found that the claimant's "uncorroborated testimony was contradicted by other evidence." *Id*. at 1254 (¶31). The supreme court in *Short* reviewed the evidence presented to the Commission, including evidence that the claimant "made inconsistent statements about when he first had back pain. His supervisor, based on an acquaintance of thirty-two years, cast doubt on [the claimant's] truthfulness." *Id*. at 1253 (¶29). The Commission found dispositive "the absence of evidence from a physician regarding a causal connection between [the claimant's] job and his injury." *Id*. at (¶30). Although the supreme court in *Short* "recognize[d] the rule that the work[ers'] compensation law should be broadly and liberally construed, that doubtful cases should be resolved in favor of compensation," the supreme court also expressed the importance of investigating a claim: "the rule of liberal construction may not be extended so as to eliminate the necessity of making proof prerequisite to recovery . . . ." *Id*. at 1253-54 (¶30) (quoting *Ingalls Shipbuilding Corp. v. Howell*, 221 Miss. 824, 832, 74 So. 2d 863, 865 (1954)).[26]

---

[26] In *Blue Cross & Blue Shield of Miss. Inc. v. Campbell*, 466 So. 2d 833, 841 (Miss. 1984), the supreme court stated that it "will not hesitate condemning an insurance company refusing to pay a claim when there is no legal reason for it to deny the claim." However, the supreme court clarified that "we have an obligation to support any insurance company fulfilling its lawful responsibility of investigating any claim which is dubious. It is not the function of this Court to penalize honest and realistic evaluations of claims." *Id*. In his opinion denying rehearing on that same case, Justice Hawkins explained:

> When the presentation of all evidence has been completed by both sides, it is the function and responsibility of the trial court to determine whether the insurance carrier had a reasonably arguable basis, either in fact or in law, to deny the claim. If he finds there was a reasonably arguable basis to deny the claim, then the plaintiff is not entitled to have the jury consider any "bad faith" award against the insurance company.

*Id*. at 842.

¶75.    Additionally, in *Windmon*, 926 So. 2d at 873 (¶25), the supreme court found that the claimants failed to meet their burden of demonstrating that the insurer acted in bad faith in denying their uninsured motorist claim. The supreme court acknowledged that the claims adjuster "may not have performed her adjusting duties in the ideal fashion" but determined that "the record demonstrates at most mere negligence" on the adjuster's part. *Id*. The supreme court also held that the insurer possessed "a valid and arguable reason to deny" the claim. *Id*. at (¶24).

¶76.    In applying precedent to the evidence in the present case, the record reflects that Liberty possessed an arguable, good-faith basis for its initial denial, and subsequent investigation and discovery, of Tutor's uncorroborated claim.[27] This finding is supported by the medical records discussed at length herein that Liberty received in discovery and that provided conflicting reports regarding the nature and onset of Tutor's back injury.

¶77.    As stated, the face of Tutor's petition to controvert contained incomplete information and set forth that Tutor sustained his injury after he was chased by a dog without providing any additional explanation or corroborating witnesses. The petition was also filed without any supporting medical records or medical authorizations. Upon receipt of the petition to controvert, Liberty requested discovery, including medical records. Mississippi Workers' Compensation Rules provide Liberty with the right to conduct discovery. Because Tutor was represented by legal counsel in his petition to controvert, Liberty was required to conduct its discovery requests through legal counsel. *See* Miss. Workers' Comp. Comm'n Proc. R. 2.20;

---

[27] *See Lisanby*, 47 So. 3d at 1178 (¶18); *McKneely*, 862 So. 2d at 535 (¶16).

John R. Bradley and Linda A. Thompson, *Mississippi Workers' Compensation Law* § 6:15, 311 (2019 ed.). On September 19, 2012, Liberty requested the EME from Dr. Davis in light of Tutor's uncorroborated claim, as well as all of the various conflicting medical records and evidence indicating that Tutor's injury was not work-related. Despite objections from Tutor's counsel, the Mississippi Workers' Compensation Commission granted Liberty's motion to compel the EME. Dr. Davis performed the EME on October 31, 2012. The record shows that after Liberty received Tutor's EME report, Liberty filed an amended answer on November 6, 2012, and accepted compensability for Tutor's worker's compensation claim.

¶78. After reviewing the evidence in the light most favorable to Tutor, we find that in accordance with precedent, Tutor failed as a matter of law to meet his burden of proving that Liberty committed bad faith in its handling of his claim. *See Lisanby*, 47 So. 3d at 1178 (¶18). Extra-contractual damages "are not warranted where the insurer can demonstrate 'an arguable, good-faith basis for denial of a claim.'" *Id*. As stated, the claimant bears the burden of demonstrating that the insurer had no arguable reason for denying the claim. *Caldwell*, 686 So. 2d 1092. Tutor's burden of proving his bad-faith claim against Liberty "goes beyond proving mere negligence in [Liberty's] performing the investigation. The level of negligence in conducting the investigation must be such that a proper investigation by [Liberty] would easily adduce evidence showing its defenses to be without merit." *Windmon*, 926 So. 2d at 873 (¶25).

¶79. Moreover, we find that the record reflects that Liberty demonstrated an arguable, good-faith basis for its initial denial of Tutor's claim. *See Lisanby*, 47 So. 3d at 1178 (¶18).

38

Liberty, as the insurance carrier, had the right to fully investigate Tutor's incomplete and uncorroborated petition to controvert since it failed to establish a prima facie case of disability and did not show Liberty's defenses to be without merit. *See McKneely*, 862 So. 2d at 534 (¶12); *Caldwell*, 686 So. 2d at 1097. The record also reflects that Liberty maintained an active role in the investigation of Tutor's claim and accepted compensability of Tutor's claim once the EME report resolved the conflicting and ambiguous medical information. Precedent reflects that where an insurance carrier delays payment of a valid claim, damages for a bad-faith claim "will not lie if the carrier has a reasonable cause for such denial or delay." *McKneely*, 862 So. 2d at 533 (¶9) (holding "that an insurer's decision to deny benefits may ultimately turn out to be incorrect does not in and of itself warrant an award of punitive damages if the decision was reached in good faith").

¶80. The evidence presented at trial was insufficient to support the jury's verdict. For the reasons set forth above, we find that the trial court erred by failing to grant Liberty's motion for a directed verdict and motion for a JNOV. We therefore reverse the jury's verdict[28] and the trial court's judgment awarding Tutor extra-contractual damages in the amount of $100,000 and we render a judgment notwithstanding the verdict in favor of Liberty. Because we find this issue dispositive, we decline to address Liberty's remaining assignments of error.[29]

---

[28] The jury returned a verdict in favor of Tutor on his claim for punitive damages, but the jury awarded no damages against Liberty. However, our reversal includes the jury's verdict that Tutor is entitled to punitive damages.

[29] *See generally Windmon*, 926 So. 2d at 877-78 (¶46) (affirming a trial court's grant of an insurer's motion for a directed verdict and further holding that "[b]ecause the same

¶81.   **REVERSED AND RENDERED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, TINDELL AND C. WILSON, JJ., CONCUR.   LAWRENCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., AND TINDELL, J.  McDONALD AND McCARTY, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND McCARTY, JJ.**

**LAWRENCE, J., SPECIALLY CONCURRING:**

¶82.   I agree with the dissent in expressing the importance of the jury as the finder of fact in the judicial system.  However, in this case, I agree with the majority that there was insufficient evidence to demonstrate bad faith.

¶83.   "[A] claimant may maintain an action in tort for an insurance carrier's or self-insured employer's bad faith refusal to investigate or pay workers' compensation benefits." *Hardaway v. Howard Indus. Inc.*, 211 So. 3d 718, 723 (¶21) (Miss. Ct. App. 2016).  As the majority notes, "Mississippi law does indeed impose a duty upon the insurance company to promptly and fully investigate any claim . . . [that] involves the obtaining of all available medical information relevant to the claim." *Life & Cas. Ins. Co. of Tenn. v. Bristow*, 529 So. 2d 620, 623 (Miss. 1988).  "Extracontractual damages, such as awards for emotional distress and attorneys' fees, are not warranted where the insurer can demonstrate 'an arguable, good-faith basis for denial of a claim.'" *United Servs. Auto. Ass'n (USSA) v. Lisanby*, 47 So. 3d 1172, 1178 (¶18) (Miss. 2010).

¶84.   The petition to controvert in this case was filed on or about May 9, 2012.  Mississippi

---

standard governs a [motion for a JNOV], we find the trial court properly denied the [claimant's] motion for [a JNOV]").

40

Workers' Compensation Commission Procedural Rule 2.4 requires the employer or carrier to file an answer to the claimant's petition to controvert within twenty-three days. Rule 2.4 also cautions that "[a]verments contained in claimant's [p]etition to [c]ontrovert to which a responsive answer is required are admitted unless denied in the [a]nswer." Liberty received the petition on May 14, 2012. On May 16, 2012, Liberty filed an answer denying the allegations listed in Tutor's petition to avoid admissions as provided in Mississippi Workers' Compensation Commission Procedural Rule 2.4. Finally, the Mississippi Workers' Compensation Commission's Procedural Rules provide an insurance carrier with the right to conduct discovery upon receipt of a petition to controvert. Miss. Workers' Comp. Comm'n Proc. R. 2.4, 2.7.

¶85. Tutor signed the authorization releasing his medical records on May 23, 2012, but Liberty did not receive that authorization until May 31, 2012. Liberty then began obtaining Tutor's medical records through the summer and fall of 2012. Liberty filed an amended answer on September 19, 2012, and again on November 6, 2012, based on information the discovery process was providing. In November 2012, Liberty paid all indemnity benefits, as well as Tutor's medical expenses. Further, that same month, Liberty also paid Tutor for his total loss of wage-earning capacity in the amount of $160,000.

¶86. Liberty initially denied all of Tutor's allegations apparently in an effort to avoid the imposition of the rules of the Commission deeming any non-denials to be admissions and to further comply with the Commission's imposed twenty-three-day time limit to answer. The record is clear, though, that Liberty had limited information from the petition to controvert.

41

Although that petition to controvert listed eighteen different medical providers who had provided treatment to Tutor up until that point, it provided no medical records. Liberty started obtaining those records by subpoena once Tutor provided a medical release. Further, Liberty requested an employee medical evaluation, which, after some delay caused by Tutor, was finally performed by Dr. Davis on October 31, 2012. After that, Liberty received Dr. Davis's report dated October 31, 2012, which stated the following: "It is my opinion with a reasonable degree of medical probability that Tutor did indeed suffer an injury on the job associated with a twisting injury on 09/01/2011 and that the care that he has obtained since that point is indeed directly causally related to that injury."

¶87. It is interesting to note that when Liberty received that medical record, it paid Tutor's medical bills and paid him $160,000 for his disability. Then the claims investigation turned to whether Tutor was at maximum medical recovery. While I agree companies should comply with Mississippi law and not unnecessarily delay payments to claimants nor delay legally imposed investigative duties as to claims submitted, I do believe the evidence in this case was insufficient to allow a jury to find bad faith under the limited facts of this case. Further, the Commission's rules allowed and authorized discovery to determine the legal sufficiency of the claim. The evidence in this particular case shows that is exactly what occurred; and not only did Liberty file amended answers at two different points after conducting discovery, it agreed and settled the claim by November 2012, some six months after proceedings began.

¶88. The law should not authorize the right to conduct discovery but then punish that party

with allegations of bad faith when they avail themselves of that right. It would be a gross understatement to say Tutor's medical records were easily ascertainable and understood. They were voluminous. The law mandated that Liberty conduct an investigation into the claim Tutor submitted, and that is what Liberty did. Once done, Liberty then paid the claim and did so within six months from the petition to controvert. I agree with the majority that the facts of this particular case demand the reversal and rendering of the verdict.

**BARNES, C.J., AND TINDELL, J., JOIN THIS OPINION.**

**WESTBROOKS, J., DISSENTING:**

¶89. I am of the opinion that there is substantial, credible, and reasonable evidence to support the jury's finding that Liberty lacked an arguable reason for delay. Therefore, I respectfully dissent.

¶90. Access to courts and the resolution of disputes by juries has been a long recognized and fundamental part of our constitutional republic. As such, great deference has been and should be given to jury verdicts. In this case, we have a unanimous jury verdict, and the trial judge denied Liberty's request to overturn that jury's verdict. In reviewing the trial court's denial of a motion for a JNOV, this Court is required to test "the legal sufficiency of the evidence supporting the verdict," not the weight of the evidence. *Tharpe v. Bunge Corp.*, 641 So. 2d 20, 23 (Miss. 1994). This Court must "consider all evidence in the light most favorable to the non party [] and . . . . view all reasonable inferences in that party's favor." *Braswell v. Stinnett*, 99 So. 3d 175, 178 (¶10) (Miss. 2012) (citing *Thompson v. Nguyen*, 86 So. 3d 232, 236 (¶12) (Miss. 2012)).

43

¶91. When reviewing the instant case, and the relevant evidence in light of our long-standing and unambiguous authority cited above, it is imperative to remember that our Supreme Court has consistently given deference to jury verdicts, even when it is clear the jury could have decided either way; for example in *State Farm Mutual Automobile Insurance Co. v. Grimes*, 722 So. 2d 637, 640 (¶9) (Miss. 1998), our Supreme Court admitted that both sides were persuasive while still affirming the jury's decision, holding that "[a]lthough the present issue is a very close one, this Court concludes that a jury could have validly found that State Farm lacked an arguable basis for denying the claim." The facts in *Grimes* were such that reasonable minds could have easily differed. In fact, there was conflicting testimony offered by both parties regarding the keys issues, but the Supreme Court said the jury gets the benefit of being in the best position to make a determination. *Id*. The court held that "[t]he inference possibly drawn by the jury, however, is also within the range of possible inferences. The jury had the benefit of seeing the witnesses testify in person. It is for the jury to assess whether State Farm conducted a good faith investigation as opposed to one designed to reach a desired result, the denial of the claim." *Id.* at 642 (¶20)). The appellate court's role is to affirm if the evidence is sufficient, even when the outcome at trial could have been different. *Id*. at 640 (¶9). Our Supreme Court has articulated such a point by stating:

> Certainly, had the jury refused to award punitive damages on this proof, such a verdict would have been beyond our authority to disturb. In fact, however, the jury did return a verdict for punitive damages, although considerably more modest than many we have reviewed in recent years. Out of deference to the jury's verdict in accordance with the rules of law and principles of appellate review enumerated above, we decline to disturb the judgment below.

44

*Life Ins. Co. Of Miss. v. Allen*, 518 So. 2d 1189, 1193 (Miss. 1987). Deference to jury verdicts has been the precedent in Mississippi and should remain the precedent in Mississippi. It takes more than the potential for a different outcome to justify reversal. Our Supreme Court stated that "[w]here the trial court allows the question of reasonableness to be put to the conscious of the community, the civil jury, that decision should stand absent compelling grounds for reversal." *Grimes*, 722 So. 2d at 643 (¶22). Precedent demands that we give deference to the jury, even when the outcome does not match our personal opinion. Our job, our specific role, is to look at the evidence and testimony presented, review that evidence in the light most favorable to the nonmoving party, and give the nonmoving party all favorable inferences that can reasonably be drawn from the evidence— nothing more. The community has spoken in the instant case, and no compelling grounds for reversal are present.

¶92.     The sentiment and precedent discussed above has been echoed by this Court. In *Knight v. Clark*, No. 2017-CA-00722-COA, 2019 WL 1448749, at *6 (¶24) (Miss. Ct. App. Apr. 2, 2019) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)), Judge Wilson, writing for the majority, specifically discussed our role as an appellate court:

> We do not re-weigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury. Our role as appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

Writing for this Court, Judge Wilson said that "our role as an appellate court is even more limited than that of the trial judge." *Knight*, 2019 WL 1448749 at *6 (¶25). Further, "the trial

judge is accorded discretion, and our review is deferential, because the trial judge is in a 'superior position to decide such matters.'" *Knight*, 2019 WL 1448749 at *6 (¶25).

¶93.    Judge Wilson further outlined the role of juries and the deference given to their verdicts as follows:

> "However, the jury was free to reject that evidence 'entirely' and give greater weight to the testimony of Dr. Clark, who consistently maintained that he did not misplace the screw during the surgery. 'The jury may give whatever weight it chooses to a witness'[s] testimony or other evidence.' 'Once again, the jury is the sole judge of the credibility of witnesses and the weight of the evidence.' And it is the 'province of the jury' to resolve any conflicts in the evidence."

*Knight*, at 2019 WL 1448749, at *7 (¶28) (citations omitted). Judge Wilson beautifully illustrated the unique and qualified position the trial court and jury hold when he said, "Unlike an appellate court, which must rely on a 'cold, printed record,' the trial judge hears and observes the witnesses firsthand and 'smells the smoke of the battle.'" *Knight*, at 2019 WL 1448749 at *6 (¶25). As our Supreme Court has stated, the winner in battle is decided by the jury. *Knight*, 2019 WL 1448749 at *7 (¶30).

¶94.    In denying Liberty's subject motion, the trial judge held that Tutor provided sufficient evidence against Liberty for the jury to conclude that Liberty's actions were without a legitimate or arguable reason and that the handling of Tutor's workers' compensation claim was done with reckless disregard. The trial judge's ruling identifies the conduct at issue before the jury:

> The general rule is that recklessness can amount to willfulness in a tort requiring intentional conduct. Applying that standard to the [instant] case, the court finds that taking all of [Tutor's] evidence and every inference that can be drawn from that evidence, that the jury could find that Liberty . . . by turning over the file and just relying on the lawyer to take care of everything

46

after that could be found - although the jury could find otherwise depending on the facts of the case - that that could amount to sufficient proof.[30]

The jury found for Tutor against his workers' compensation carrier, Liberty. As the trial judge stated, the jury could have found differently. This Court, as quoted in *Knight* above, has repeatedly acknowledged the deference given to the trial courts. At issue here is whether the evidence was sufficient to support the jury's verdict against Liberty. The jury heard all the evidence and testimony. They weighed the evidence and testimony, as is their right and their job. The jury determined Liberty was without excuse in deciding to summarily deny Tutor's claim. The jury determined Liberty should have followed its own internal guidelines and attempted to gather information readily available to them had Liberty asked for it. The deference discussed above by this Court does not only apply when physicians and insurance companies are successful at trial; that deference applies equally to individuals like Tutor.

¶95.    Liberty had its day in court and had the opportunity to present evidence and testimony of its defenses at trial. It is my opinion the majority has ignored our specific and narrow instructions with regard to reviewing the trial court's denial of Liberty's JNOV and instead substituted their judgment for that of the jury.

¶96.    To be successful in his claim against Liberty, Tutor bears the burden of proving "[t]hat the insurer either lacked a legitimate or arguable basis for denying his claim or that it

---

[30] Both the majority and the special concurrence fail to acknowledge that the issue is not Liberty's right to conduct discovery. As the trial judge properly noted, the jury correctly looked at Liberty's conduct upon receipt of this claim. This case is not a personal injury case but rather a workers' compensation case. Had Liberty asked any questions upon receipt, it could have accepted the claim and evaluated the injury without causing inexcusable and unjustifiable delay.

committed a willful or malicious wrong or acted with gross and reckless disregard for his rights." *Chapman v. Coca-Cola Bottling Co.*, 180 So. 3d 676, 681 (¶22) (Miss. Ct. App. 2015). The supreme court has further stated that "the plaintiff's burden in proving a claim for bad faith refusal goes beyond mere negligence in performing the investigation. The level of negligence in conducting the investigation must be such that a proper investigation by the insurer would easily adduce evidence showing its defenses to be without merit." *United Servs. Auto. Ass'n (USSA) v. Lisanby*, 47 So. 3d 1172, 1178 (¶18) (Miss. 2010) (quoting *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 534 (¶12) (Miss. 2003)). The trial court instructed the jury as follows:

> If you find that the Defendant, Liberty, one, lacked a legitimate, arguable reason for the alleged delay in paying or authorizing those Workers' Compensation benefits denied or delayed between the date of May 14, 2012, and November 30, 2012; and, two, such alleged delay or denial was reckless, you must find for the Plaintiff, Mr. Tutor, and award him compensatory damages against Liberty as later described in these instructions.

> If you find by a preponderance of the evidence in this case that Defendant Liberty's investigation of Plaintiff's – of Plaintiff Anthony Tutor's claim was unreasonably and recklessly delayed by said investigation and that the Defendant, Liberty, failed in its continuing responsibilities which it owed Plaintiff, Anthony Tutor, to promptly and reasonably investigate Plaintiff Anthony Tutor's claim, then you should find for the Plaintiff, Anthony Tutor.

The jury was properly instructed. Tutor presented sufficient evidence to prove Liberty acted without a legitimate or arguable reason, and the verdict against Liberty should be affirmed.

¶97. The main issue before this Court is whether there was sufficient evidence for the jury to find that Liberty was without a legitimate or arguable reason for its delay with regard to its initial denial of Tutor's claim for workers' compensation benefits. The proper analysis

should focus on the evidence and testimony presented to the jury, including but not limited to the undisputed facts concerning Tutor's employment at the time of the subject incident, the filing of the petition to controvert, Liberty's immediate and complete denial of Tutor's claim without investigation, Liberty's right to investigate and conduct discovery, medical documentation and testimony concerning the work related-injury, and testimony from both Liberty's expert and Tutor's expert concerning whether Liberty followed its own guidelines and industry standards.

¶98.    Tutor worked as a package-delivery driver for UPS. At the time of the subject incident, Liberty was the workers' compensation carrier for UPS. Off and on through the years, Tutor saw a chiropractor for preventative maintenance on his back to relieve stiffness and soreness associated with normal wear and tear. Tutor testified his visits were short. No testimony or evidence was presented at trial claiming these prior visits were because of a work-related injury.  During his 22 years of employment at UPS, Tutor never missed work because of any injury, and no testimony was offered to challenge his injury-free work history. On September 1, 2011, some six-plus weeks since his last visit to the chiropractor, Tutor injured his back while attempting to deliver a 60-pound package. While carrying the package upstairs, a dog startled him, causing Tutor to awkwardly twist his body. Tutor testified that he felt a pop in his back and subsequent pain. UPS actually warns its employees to be aware of dogs and the potential for injury. Such an incident, while uncommon in certain vocations, would not have been uncommon for employees at UPS.

¶99.    After hurting his back, Tutor followed protocol and called his boss April Dallas to

report the injury. Dallas brought Tutor's other supervisor Gary Bishop to help Tutor finish his route. According to protocol, Dallas should have immediately reported this work related injury to Liberty. Instead, Dallas instructed Tutor to call her after his route was completed. Tutor called Dallas as he was instructed to do. During this second conversation, Tutor advised Dallas he was too injured to work the next day. Tutor also mentioned his previous chiropractic treatment. Dallas advised him to go to the ER because it was too late in the day to see a private physician. As was his right, Tutor advised her he would elect to see his own physician the next day, which he did. Dallas never reported the injury as protocol mandated she do after having an employee report a work-related injury. Because Dallas never reported the claim and decided on her own, without consulting anyone, that Tutor's periodic chiropractic treatment amounted to a pre-existing injury, Tutor was forced to file and receive short-term disability.

¶100. Eventually, the short-term disability ended, and Tutor was still experiencing pain from his injury. He retained counsel and filed a petition to controvert a workers' compensation claim with Liberty on May 12, 2012. Upon being served with the petition to controvert on May 14, 2012, Liberty had 23 days remaining to conduct an investigation prior to making a decision to accept, partially accept, or summarily deny benefits. Liberty not only had 23 days to make initial inquiries, Liberty's own policies and procedures mandated they speak with employees of their insured (UPS) in an attempt to gather as much information as possible. According to Bonnie King, the senior claims consultant in charge of Tutor's claim, Liberty elected to call no one. Instead, King elected to instruct defense counsel to summarily deny

the petition to controvert on May 16, 2012. Had Liberty followed its own internal protocol, it could have obtained information relative to their analysis of Tutor's claim for benefits. Instead, Liberty chose to completely deny Tutor's claim two days after receiving his petition without conducting any investigation.

¶101. The jury heard no testimony to explain why Liberty ignored its own policies and procedures upon receipt of Tutor's petition to controvert. Bonnie King testified she summarily denied Tutor's claim within 48 hours of receipt because she needed to investigate. Yet, her testimony revealed she did not investigate this matter before choosing to deny it completely. She had no evidence of a pre-existing injury, no evidence disputing Tutor's claim of a documented and verifiable work-related injury and no conflicting documentation. She spoke with Dallas yet asked her no specifics about her alleged concerns of a pre-existing injury:

> Q.    Did you ask her anything else?
>
> A.    No, sir. Just to get the report filed with me.

Liberty, specifically King, claims as their main reason for denying and delaying payment to be their need for and right to investigate this claim. Yet, as King further testified, she did not bother to obtain any information even the first report of injury she asked Dallas to provide her. The record shows the following dialogue:

> Q.    Do you have a copy of that report?
>
> A.    I don't.

It is significant to note that the jury heard the above testimony and much more concerning

Liberty's claim of the need to investigate. King denied this claim after receiving the petition to controvert and one phone call with Dallas, wherein the only thing she asked was for a first report of injury. At the time of her deposition in December, 2012, King claimed she still had not seen the first report of injury.

> Q. [By plaintiff's counsel:] And did you find that B-3 of the first report of injury that you saw was made?
>
> A. No, sir.

She did not call Gary Bishop:

> Q. Did you call Mr. Bishop?
>
> A. No, sir.
>
> Q. He was the man's supervisor, Mr. Tutor's supervisor and you did not call him.
>
> A. No, sir.

The only document, other than the petition to controvert, in King's possession when she chose to deny Tutor's claim was the report of injury created by April Dallas. The jury heard testimony that that document provided no information different from the petition:

> Q. And who did that first report of injury?
>
> A. April Dallas.
>
> Q. And does it confirm in that document that Mr. Tutor was injured on September the 1st, 2011?
>
> A. There's – its just basically this statement; that he was walking up steps and a dog ran out under the steps.
>
> Q. And that he was injured.

A.    Yes, sir.

Q.    And it doesn't say anything about a pre-existing injury.

A.    No, sir.

King and Liberty claim they had conflicting information regarding this work-related injury when they denied this claim. They did not. And they failed to perform any investigation yet claim they needed to investigate. King did not even ask Dallas or anyone for medical records that were readily available to her:

Q.    And did you request any medical records?

A.    No, sir.

King instead chose to deny the entire claim and have the lawyers slowly subpoena information readily available to her.  It is important to point out, again, that King and Liberty claim they were only working with the information they had at the time. But that information presented them with uncontested verification of a workers' compensation claim. King admitted that all the information they had indicated an injury at work, yet she denied the claim and defends the decision by saying they did not have enough information. King testified as follows:

Q.    Don't these documents indicate he's hurt at work?

A.    It indicates – it indicates he's hurt.

Q.    Yet you made the decision on behalf of Liberty and on behalf of UPS that y'all will deny all of the allegations in the summons and complaint filed by the Plaintiff.

A.    Yes, sir.

Q. Why?

A. Because we answered the complaint simply on the fact that we had – all the information we had at the time.

Q. Which was exhibits 1, 2, and 3.

A. Yes, sir.

King had no evidence conflicting with or disputing Tutor's petition to controvert when she made the decision to deny everything. She testified that Liberty is required to make certain minimal contacts within one to two days of receiving a new claim. King could not give a justification for why she chose to ignore these initial contact requirements in favor of the blanket denial of Tutor's claim. King admitted that she never attempted to call Bishop. Bishop was not only Tutors' other supervisor, he was also the closest thing to a witness because he rode with Tutor for hours after Tutor called and reported the injury. King could have called Dallas, Bishop, and even Tutor's own counsel in an attempt to gather information prior to denying the entire claim, but she did not.

¶102. King's testimony illustrates an important facet to this case as it was presented to the jury. Liberty claims they had a legitimate and arguable reason to deny and delay payment of this claim because they needed to investigate. No one disputes that Liberty, through its attorneys, had a right to conduct discovery. Liberty had a duty to investigate but chose instead to summarily deny Tutor's claim and send it straight to litigation. Such inaction did not satisfy Liberty's claims-handling duties. Initial claims investigations are the specific duty of Liberty, and that is completely different and independent from defense counsel's right to conduct discovery during litigation. The jury heard no testimony that Liberty ever conducted

54

their initial-claims investigation. The jury did hear that Liberty received a sufficient petition to controvert, created a first report of injury, and spoke with Dallas at UPS. None of those documents were incomplete. None of the information cast doubt on Tutor's claim as pled in the petition, reported in the first report of injury, or relayed by Dallas to King. They provided Liberty with a valid claim of a work-related injury and a lengthy list of doctors who treated Tutor. Liberty neither asked UPS for medical records nor called the physicians listed in the petition to controvert. There was no mention of a pre-existing injury at the time Liberty chose to deny the claim and delay its processing.

¶103. In addition to the particulars of Tutor's injury, the majority focuses on Liberty's right to investigate and conduct discovery in an attempt to show evidence of Liberty's legitimate or arguable reason for delay. No one disputed Liberty had a right to investigate this claim. In fact, Liberty had a duty to investigate this claim. Liberty's own policies mandated they immediately investigate this claim. Perhaps if Liberty had made any attempts to contact employees at UPS or Tutor's attorney prior to their blanket denial, we would not be here. However, at trial the jury heard evidence and testimony concerning whether or not Liberty's undisputed delay was legitimate or had an arguably reasonable basis in fact. It was never disputed that Tutor was injured after a dog startled him while employed with UPS on September 1, 2011, yet Liberty denied he was even an employee of UPS at the time of the subject incident in their response to the petition to controvert. By summarily denying the petition to controvert, Liberty chose not to make any, let alone a prompt, investigation. In footnote 23, the majority characterizes Tutor's petition to controvert as incomplete. It was

not. Reasonable minds may differ as to what Liberty should have and could have done prior to summarily denying the entire claim without investigation, but the petition was not incomplete. It provided Liberty with not just sufficient notice of a work-related injury, it provided Liberty with a road map for its investigation had Liberty chosen to perform one.

¶104. There was absolutely no dispute that Tutor's injury occurred while performing his job as an employee of UPS on September 1, 2011. Neither should the focus be directed toward conflicting medical records and documentation. There was no conflicting testimony concerning his injury presented to the jury. Not one person provided evidence claiming Tutor's injury occurred somewhere other than work. The only document claiming this injury did not happen at work is Liberty's answer to the petition wherein it denied Tutor was an employee of UPS and further denied he was injured at work. There has been ample testimony to show they had no basis for such a claim and no evidence challenging anything that Tutor claimed: he was acting in the course and scope of his duties when the incident happened. Whether or not Tutor had a pre-existing injury would have no bearing on his right to recover under workers' compensation laws. The law is clear that an injury occurring at work that contributes to or aggravates a pre-existing condition is still compensable. Miss. Code Ann. § 71-3-3(B) (Rev. 2011). A pre-existing condition aggravated by a work-related injury is not a bar to workers' compensation benefits. *Id.* Workers' compensation law does not treat pre-existing injuries or conditions the same as in other insurance contexts. *Id.*

¶105. The majority speaks of conflicting medical testimony. However, we cannot ignore that Liberty initially chose not to obtain, let alone review, any medical documentation prior to

denying Tutor's petition to controvert. Liberty could have obtained the same medical documentation referenced in the employer medical examination (EME) from its insured or by using the medical authorization forms in its possession. Even after the blanket denial, Liberty never attempted to obtain medical information from its insured or use the medical authorizations. Had Liberty followed its own guidelines by conducting any investigation within the first 48 hours, rather than electing to deny and do nothing, Liberty could have received basic information that could have allowed payment of Tutor's claim without the resulting six-month delay. Tutor was injured at work and sought treatment. No physician stated otherwise. There were no inconsistencies regarding relevant medical documentation and related testimony presented at trial. Specifically, the physician that Liberty hired to perform an EME stated that the medical records and documentation he reviewed

> evidenced a well-documented work injury on 09/01/2011 that was reported immediately and led to a supervisor coming and working with him for the remainder of the day. The patient has consistently given exactly the same description of his injury. Of twisting while he was carrying a box weighing about 60 pounds due to a dog barking at him and perhaps lunging at him. While it is clear that Tutor did seek and receive chiropractic care for what was sometimes described as low back discomfort and sometimes described as mid-back discomfort either on the left or the right hand side, he is clear in stating today that that was treatment he sought just because it helped with stress. Furthermore, the testimony of both his supervisors was that he never complained of back or spine problems while working at UPS nor did he ever miss any work while at UPS due to a back or spine problem. Furthermore, his treating chiropractor in reevaluating him noted and wrote in a letter than his problems since 9/1/2011 are completely different from what he was treating the patient for prior to that date. Additionally according to the records that I have, Tutor's last visit with the chiropractor was on 7/13/2011 or greater than six weeks prior to his reported work injury of 9/1/2011.

Upon receiving the EME, Liberty accepted and paid Tutor's claim. Significantly, Liberty

found the medical documentation, and the EME based upon that documentation, credible enough to pay Tutor's claim. To now characterize that same documentation as conflicting to suggest that Liberty had an arguable reason to deny or delay payment is an attempt to re-litigate this case on behalf of Liberty, which is outside the scope of our appellate review.

¶106. Liberty's expert, James Higginbotham, testified the law allows a carrier to admit or deny a claim pending further investigation. He admitted that Liberty could have and should have attempted to contact Tutor's lawyer to obtain information. He further admitted that Liberty could have interviewed employees of its insured (UPS) during the entire claims process. He testified Liberty should have filed a "First Report of Injury" but did not. On cross, he admitted Liberty could have obtained medical information without a medical authorization form. Higginbotham even admitted that Liberty never used the medical authorization forms it received. He further admitted where the claimant, as in the case of Tutor, has shifted the burden of proof regarding causation to the carrier, a carrier must have medical testimony to support any subsequent causation defense. Finally, Liberty's own expert admitted that Tutor complied with every one of his duties and each request made.

¶107. Tutor's expert, Lydia Quarles, was a former workers' compensation judge and former commissioner of the workers' compensation commission. She was accepted as an expert and testified that Liberty's handling of Tutor's claim lacked a legitimate or arguable reason with regard to the six-month delay. She further testified that Liberty did not follow its own internal protocols. Quarles testified Liberty failed, without legitimate or arguable reason, to conduct a reasonable and prompt investigation. She testified such a conclusion was based on

Liberty's failure to gather basic information readily available to it through its insured (UPS). Among the documents Liberty failed to retrieve are: (1) the First Report of Injury Form; (2) the Injury Prevention Report; (3) Tutor's personnel file;( 4) name and contact information of Tutor's supervisor Gary Bishop; and (5) medical documentation already faxed to UPS containing a physician statement causally connecting the subject injury to work. Quarles further testified Tutor provided a medical waiver to Liberty, which gave Liberty permission to speak directly with Tutor's treating physicians. Quarles testified that Liberty was required by its own guidelines to investigate, through the available means cited above, within 24 hours of receiving the claim.

¶108. The majority's reliance on *Short v. Wilson Meat House LLC*, 36 So. 3d 1247 (Miss. 2010), is unpersuasive. Unlike the instant case, *Short* involved a claim with numerous contradictions. *Id*. at 1248 (¶6). Numerous employees testified. Whether the claimant's injury happened while at work was questioned through testimonies of witnesses who did not remember if Short even helped moved a desk that allegedly caused his injury. *Id*. at 1249 (¶10). There was conflicting testimony concerning whether he was even injured on the date in question. Further, there was testimony he claimed numerous other injuries leading up to the subject incident. Several witnesses, including Short, provided conflicting testimony about whether Short had other part time jobs. There was even testimony about an injury involving Short's encounter with a horse. *Id* at 1249-50 (¶10-13).

¶109. Attempting to draw factual parallels between *Short* and the instant case carries no weight. The instant case is factually distinguishable. There was no disputed testimony about

59

whether Tutor's injury happened while he was at work or if it ever happened at all. In *Short*, there was conflicting testimony about whether Short was even at work when the incident happened, was he even helping to move the subject desk, was he even injured, and if whether it happen at one of his other part-time jobs. *Id*. The trial testimony verified Tutor's version of events. He only worked for UPS, and it was never disputed he was working when the incident and subsequent injury occurred. Further, unlike in *Short*, Tutor's credibility was never questioned. In fact, Tutor was candid about his treatment with his chiropractor, which should have bolstered his credibility. Unlike Short, who arguably did not list witnesses because he feared what they might say, Tutor did not list any witnesses on his petition because he was a delivery driver and worked alone. There were no witnesses. The instant case is also procedurally distinguishable from *Short*. Tutor's case involves a jury verdict for lack of a legitimate or arguable reason for delay. *Short* involves appealing the Worker's Compensation Commission's decision to deny Short benefits. *Id*. at 1248 (¶1). Liberty eventually accepted and paid Tutor's claim in full. It was the allegation of bad-faith handling and lack of an arguable reason for delay at issue before the Tutor jury.

¶110. A more analogous case would be *Amfed Co. LLC v. Jordan*, 34 So. 3d 1177 (Miss. Ct. App. 2009), which did not concern a denial of benefits but rather a delay in payment of a valid claim for benefits, like the instant case. In *Amfed*, just as the instant case, the jury found for the plaintiff, and the defendant appealed after the trial court denied their motion for a JNOV. *Id*. at 1179 (¶1). In *Amfed*, unlike with Tutor and Liberty, the claim was never denied; however, the jury ultimately found the delay was unreasonable and caused without

an arguable basis. *Id*. at 1182 (¶16-19). The problematic conduct was the failure of Amfed employees to timely fix discrepancies in payments, causing continual delay due to employee vacations and putting easy investigative tasks off on other employees. *Id*. at 1180-1181 (¶4-9). The court in *Amfed* found the jury could have determined Amfed lacked an arguable reason for delay based upon the availability of information that Amfed never tried to obtain, which could have theoretically prevented the delay. *Id* at 1184 (¶28-29). The instant case also contains delay-causing conduct, which a jury could find as much or more inexcusable than in *Amfed*, because Liberty initially denied the entire claim without conducting any investigation. The jury heard testimony that the information was readily available to Liberty had they conducted any investigation or made any attempts to obtain it.

¶111. Mississippi courts have stated that before denying a claim, an insurer must, at a minimum, interview agents and employees to determine if they have knowledge of pertinent facts pertaining to the claim. They must make a reasonable effort to secure any documentation, medical or otherwise, relevant to the claim. *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1382-85 (5th Cir. 1991). It is reasonable to conclude that the jury, having heard both experts and the other evidence and testimony offered by Tutor, chose to find Tutor's expert and subsequent testimony more persuasive. The testimony was sufficient for the jury's finding against Liberty. No evidence was offered at trial, through the experts or otherwise, disputing what Tutor claimed: that he was injured on the job and Liberty chose to deny his claim rather than perform an investigation.

¶112. In *Rogers v. Hartford Acc. & Indem. Co.*, 133 F.3d 309 (5th Cir. 1998), the court

found the carrier without justifiable reason for delay because "it is undisputed Rogers' accident arose out of and in the course of employment by either Quick Change or Speedway [and] Hartford had no justifiable reason to refuse to pay compensation benefits as required under the workers' compensation statutes." *Id.* at 314. Like in *Rogers*, no evidence disputed Tutor's claim that he was injured at work, yet Liberty denied causing any unjustified delay. At trial, Liberty attempted to divert attention away from its own inactions just as the majority is doing again here. Liberty summarily denied Tutor's claim without investigation. Liberty chose to delay the payment of benefits. No testimony at trial stated anything different. The jury found the evidence supported Tutor's claim. The evidence was sufficient to support the jury's verdict. Any attempt at this point to cast doubt on whether Tutor suffered a compensable, work-related injury only functions as an attempt to justify reversing a jury verdict based on sufficient evidence. This Court is tasked with making sure the evidence offered by Tutor was sufficient, and it was sufficient. This Court's job is not to step in as jurors, re-weigh the evidence, and re-cast their votes for them. It is solely about making sure the evidence and testimony offered at trial was sufficient.

¶113. Workers' compensation benefits are the exclusive remedy for injured workers. *Powe v. Roy Anderson Const. Co.*, 919 So. 2d 1197, 1202-03 (¶15) (Miss. Ct. App. 2005). By design, these claims are not based upon fault. Instead, an injured worker must simply show he or she was injured while working and have medical documentation from a physician demonstrating a causal connection between the injury and the work occurring incident. Miss. Code Ann. § 71-3-3. The nature and exclusive remedy component to workers' compensation

is meant to make claims move faster and smoother for injured workers because either the injury happened at work or it did not. The relationship between insurer and insured is also different and more aptly suited to move claims along. Liberty may not be able to contact injured workers represented by counsel like Tutor, but as the testimony demonstrated, they are allowed and specifically instructed to make contact with other employees of their insured like UPS. Such available means of information is vital to meeting the standards and protocols at play in this case and others like it. Liberty chose not to avail itself of information possessed by UPS or even ask for it. Tutor had been injured and treated for over six months prior to filing his petition to controvert. As such, UPS was in possession of documentation that, had Liberty asked for, Liberty would have received. The documentation could have answered any real questions Liberty might have had regarding this incident. At the very least, such an initial good-faith inquiry, as was required of Liberty, might have, in the minds of the jury, mitigated the damage such inaction caused. Instead, Liberty chose to deny the entire claim. And every investigative action they took afterward was an attempt to justify its initial summary denial of Tutor's claim. Nothing better illustrates how reasonable minds can disagree over the weight and credibility given to the evidence more than the differences between the majority opinion and this dissent. If reasonable minds could differ as to the weight and credibility of legally sufficient evidence, the jury verdict stands—period. The evidence was more than sufficient to support the jury's verdict. For these reasons, I respectfully dissent.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**